**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

No. 97-30321
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

PATRICK FRANKLIN,

Defendant-Appellant.

_____

Appeal from the United States District Court
For the Middle District of Louisiana

_____

July 22, 1998

Before WIENER, BARKSDALE, and DeMOSS, Circuit Judges.

WIENER, Circuit Judge:

Defendant-Appellant Patrick Franklin appeals his convictions
for distributing and conspiring to distribute cocaine and cocaine
base (commonly known as crack cocaine) in violation of 21 U.S.C.
§§ 841(a)(1) & 846 and 18 U.S.C. § 2.[1] Finding no reversible error
in Franklin's trial or his sentencing, we affirm.

I

FACTS AND PROCEEDINGS

From 1992 to 1994, Franklin worked with John Milton, Burlin

---

[1]21 U.S.C. §§ 841(a)(1) & 846 (1994); 18 U.S.C. § 2 (1994).

Harris, and Anthony Dozier, manufacturing and distributing crack cocaine out of a residence in Baton Rouge, Louisiana. Milton headed the operation, obtaining significant amounts of cocaine (in excess of several kilograms) from Houston, Texas, which he and the others converted to crack through a process known as "cooking." Franklin, acting under the direction of Harris, assisted in distributing crack out of the Baton Rouge residence.

The Drug Enforcement Administration ("DEA") enlisted the aid of a cooperating individual ("CI") to investigate the operation. The CI twice purchased crack from the drug-trafficking conspirators — once from Franklin (approximately 10 grams), and once from Dozier (approximately 10.3 grams). Law enforcement officials executed a search warrant for the residence, and various drug-trafficking paraphernalia was recovered, including: (1) a triple beam scale; (2) a digital scale; (3) a microwave oven containing crack residue; (4) canisters of procaine (a chemical commonly cut with cocaine for the purpose of stretching out the amount of crack produced); and (5) containers with secret compartments.

In a ten-count indictment dated March 19, 1996, Franklin and his codefendants were charged with violating 21 U.S.C. § 846 and 18 U.S.C. § 2 by conspiring to distribute, and to possess with intent to distribute, cocaine and cocaine base. Franklin was also charged, under counts four and five of the indictment, with specific acts of cocaine distribution in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Franklin made his initial appearance before the district court on April 2.  On May 30 and June 20, respectively, Harris and Dozier pleaded guilty to the offenses with which each had been charged.  Milton remained at large until August, making his initial appearance on August 15 —— 134 days after Franklin's initial appearance.[2]

On August 29, Milton filed motions requesting pretrial notice of the government's intent to use evidence of extrinsic acts and seeking to compel the government to disclose "impeaching information."  The following day, the district court ordered the government to respond to these motions within ten days; i.e., on or before September 9.  The government responded to Milton's request for impeaching information on September 19, and filed its notice of intent to use extrinsic acts evidence on September 23.  That same day, Milton entered into a plea agreement with the government, and the next day the government filed a notice of Milton's intent to enter a guilty plea.

On September 30, the government filed a motion in limine, seeking to offer other-crimes evidence at Franklin's trial.  The court accepted Milton's guilty plea on October 7.  On October 18, the government filed a second motion in limine, seeking to offer evidence of Franklin's drug use during the course of the charged conspiracy.  On October 23, the court entered an order deferring a

---

[2]See United States v. Milton, No. 97-30570 (5th Cir. Jul. 21, 1998).

hearing on the government's second motion in limine until trial,[3] and Franklin filed a motion to dismiss the charges against him on the ground that his statutory right to a speedy trial had been violated. The court heard and denied Franklin's speedy trial motion on November 1 and Franklin's trial commenced on November 4.

On November 6, a jury found Franklin guilty of all the offenses with which he had been charged. After he was sentenced to a 360-month term of imprisonment, Franklin timely appealed. He urges that because more than seventy non-excludable days elapsed from his initial appearance until his trial, the district court erred in denying his motion to dismiss the indictment for lack of a speedy trial. Franklin also contends that the district court erred in (1) allowing a witness to testify concerning Franklin's involvement in drug transactions that allegedly predate the drug-trafficking conspiracy charged in the indictment, (2) denying Franklin's motion for judgment of acquittal, finding that the evidence adduced at trial was sufficient to support his convictions, and (3) failing to sustain certain objections to the presentence report ("PSR").

II

ANALYSIS

A. SPEEDY TRIAL CLAIM

---

[3]Nothing in the record indicates what action was taken with respect to the government's first motion in limine. The parties do not dispute, however, that the resolution of that motion was likewise deferred until trial.

A trial court's factual findings underlying its ruling on a Speedy Trial Act[4] ("the Act") motion are reviewed for clear error, and its legal conclusions are reviewed <u>de novo</u>.[5] Under the Act, the trial of a defendant must commence within seventy non-excludable days from the time an indictment has been filed or from the date of the defendant's initial appearance, whichever is later.[6] Excludable periods of delay are outlined in section 3161(h).

Section 3161(h)(7) ("subsection (h)(7)") provides for the exclusion from the seventy-day speedy trial period of a "reasonable period of delay when the defendant is joined for trial with a codefendant as to whom time for trial has not run and no motion for severance has been granted."[7] Under subsection (h)(7), the speedy trial clock does not begin to run in a multi-defendant prosecution until the last codefendant makes his initial appearance in court.[8] Also, the excludable delay of one codefendant may be attributable

---

[4]18 U.S.C. §§ 3161-3174 (1994).

[5]<u>United States v. Storm</u>, 36 F.3d 1289, 1292 (5th Cir. 1994), <u>cert.</u> <u>denied</u>, 514 U.S. 1084, 115 S.Ct. 1798, 131 L.Ed.2d 725 (1995).

[6]18 U.S.C. § 3161(c)(1) (1994).

[7]18 U.S.C. § 3161(h)(7) (1994).

[8]<u>United States v. Calle</u>, 120 F.3d 43, 46 (5th Cir. 1997) (citing <u>United States v. Bermea</u>, 30 F.3d 1539, 1567 (5th Cir.), <u>cert.</u> <u>denied</u>, 513 U.S. 1156, 115 S.Ct. 1113, 130 L.Ed.2d 1077, <u>and</u> 514 U.S. 1097, 115 S.Ct. 1825, 131 L.Ed.2d 746 (1994)), <u>cert.</u> <u>denied</u>, —— U.S. ——, 118 S.Ct. 1202, 140 L.Ed.2d 330 (1998).

to all codefendants.[9]   Thus, the excludable delay incurred as a result of one codefendant's motion practice applies to the speedy trial time computation of all codefendants.[10]

Two hundred fifteen days elapsed between Franklin's initial appearance on April 2 and the commencement of his trial on November 4.   This 215-day time span, however, contains several periods of excludable delay under section 3161(h).   Franklin's speedy trial clock was tolled until Milton, his codefendant, made his initial appearance on August 15 (134 days).[11]

Thirteen chargeable days passed before the clock was again tolled on August 29, when Milton filed his motions seeking extrinsic evidence notice and impeaching information.[12]   As these motions did not require a hearing, and there is no evidence in the record that they occupied the court's attention following the government's responses, those responses constituted their "prompt

---

[9]Id.

[10]See 18 U.S.C. § 3161(h)(1)(F) (1994) (excluding from speedy-trial computations the "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion"); Bermea, 30 F.3d at 1566 ("The Supreme Court has held that § 3161(h)(1)(F) tolls the speedy trial clock during all delays between the filing of a motion and the conclusion of the hearing on that motion, regardless of whether the delay in holding that hearing is 'reasonably necessary'") (citing Henderson v. United States, 476 U.S. 321, 330, 106 S.Ct. 1871, 1877, 90 L.Ed.2d 299 (1986)).

[11]See supra notes 7-8 and accompanying text.

[12]See supra notes 9-10 and accompanying text.

disposition" under section 3161(h)(1)(F).[13] Although the government did not file its responses to both motions until September 23, the court had ordered the government to respond by September 9, and the government concedes that the speedy trial clock recommenced on the court-ordered response date.

Following September 9, twenty more chargeable days elapsed before the speedy trial clock was again tolled on September 30, when the government filed its motion in limine seeking to offer extrinsic-acts evidence at Franklin's trial. As the court deferred a hearing on this motion until trial, no additional speedy trial time expired before Franklin's trial began. Under the foregoing analysis, Franklin's speedy trial clock ran for only thirty-three days before his case was tried.

Franklin initially challenges the district court's ruling on his speedy trial motion on the ground that neither the government's nor Milton's motion practice produced excludable delays under section 3161(h)(1)(F). He claims that (1) the motions filed on Milton's behalf should not be afforded a tolling effect as they were merely pro forma discovery requests that did not invite the district court's intervention, and (2) as the government's motions seeking evidentiary rulings were deferred by the court until trial,

---

[13]See United States v. Ortega-Mena, 949 F.2d 156, 159 (5th Cir. 1991) ("Absent any indication that the court actually took [the Brady] motion under advisement following the Government's response, we will attribute only [the government's response time] to [the motion's] 'prompt disposition.'").

they did not consume the court's attention, and their pendency should likewise produce no excludable delay.

Franklin's contentions are without merit. In support of his first position, he relies on a Sixth Circuit case which (a) dealt with discovery motions filed pursuant to FED. R. CRIM. P. 16, and (b) predicated its no-tolling finding on the fact that there was no evidence in the record that the district court ever ruled on the motions at issue.[14] It is clear in the instant case that the district court, having ordered the government to respond to Milton's motions, took those motions under advisement. In advancing his second position, Franklin relies on case law from another circuit, ignoring well-settled Fifth Circuit case law to the contrary.[15]

Franklin next challenges the attribution of the Milton delays. He claims that the excludable delays associated with Milton's

---

[14]See United States v. Mentz, 840 F.2d 315, 329 (6th Cir. 1988) ("Because the district court never held a hearing or ruled on the motion, and there is no other indication that the motion was 'actually under advisement,' the motion did not trigger the statutory exclusions for delay occasioned by the filing of a pretrial motion.").

[15]See Bermea, 30 F.3d at 1568 ("We have observed that pending motions carried for hearing just before or during trial will toll the speedy trial clock indefinitely."); United States v. Santoyo, 890 F.2d 726, 728 (5th Cir. 1989) (excluding from speedy trial computation the eight-month interval between the filing of defendant's motion in limine and the hearing on that motion, notwithstanding the fact that, soon after the motion was filed, the district court announced its intention to defer the hearing until trial), cert. denied, 495 U.S. 959, 110 S.Ct. 2567, 109 L.Ed.2d 749 (1990).

8

apprehension and prosecution cannot be attributed to him under subsection (h)(7), as those delays were unreasonable. As grounds for unreasonableness, Franklin observes that Milton filed his notice of intent to plead guilty only two days before the court set Franklin's trial date (September 24 and 26, respectively). The sequence of these events, submits Franklin, belies the notion that the government intended to join Milton for trial with Franklin. As the government never intended to try the two together, reasons Franklin, there is no justification for imputing the Milton delays to him for speedy trial purposes. Franklin concludes that the government's misleading pretrial posturing, coupled with the sheer length of his detention time (215 days), suffices to establish unreasonableness under subsection (h)(7).

Franklin's argument presents this court with its first opportunity to consider the criteria by which the reasonableness of delays eligible for exclusion under subsection (h)(7) is measured. The plain language of that section indicates that its exclusions are subject to a reasonableness limitation, and such a limitation is widely recognized by other circuits.[16] The Second and Sixth

---

[16]See United States v. Salerno 108 F.3d 730, 735 (7th Cir.), cert. denied, —— U.S. ——, 117 S.Ct. 2517, 138 L.Ed.2d 1018 (1997); United States v. Fuller 942 F.2d 454, 457 (8th Cir. 1991) ("Motions filed by one defendant in a multi-defendant case count as motions filed by all of the defendants, and the reasonable time taken to determine those motions will count as excludable time for all defendants.") (emphasis added), cert. denied, 502 U.S. 914, 112 S.Ct. 315, 116 L.Ed.2d 257 (1991), and 502 U.S. 1039, 112 S.Ct. 890, 116 L.Ed.2d 793 (1992)); United States v. Monroe, 833 F.2d 95, 100 (6th Cir. 1987) (exploring the reasonableness of the delay

9

Circuits acknowledge that excludable delays arising out of one defendant's prosecution must be reasonable to be attributed to a codefendant, but refuse to allow a defendant who has failed to move for severance to challenge the reasonableness of the delay on appeal.[17]  The more common approach, and the one taken by the Eleventh Circuit, is to view a defendant's failure to move for severance as relevant to, but not per se dispositive of, the reasonableness inquiry.[18]

    We choose to adopt the Eleventh Circuit's methodology for

occasioned by one codefendant's pretrial motions in determining whether that delay was properly excludable as to the other codefendant); United States v. Theron, 782 F.2d 1510, 1514 (10th Cir. 1986); United States v. Darby, 744 F.2d 1508, 1517 (11th Cir. 1984), cert. denied, 471 U.S. 1100, 105 S.Ct. 2322, 85 L.Ed.2d 841 (1985); United States v. Novak, 715 F.2d 810, 814-15 (3d Cir. 1983), cert. denied, 465 U.S. 1030, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984).

    [17]United States v. Vasquez, 918 F.2d 329, 336-37 (2d Cir. 1990); United States v. Culpepper, 898 F.2d 65, 67 (6th Cir.), cert. denied, 498 U.S. 856, 111 S.Ct. 155, 112 L.Ed.2d 120 (1990).

    [18]See United States v. Olivo, 69 F.3d 1057, 1062 (10th Cir. 1995) (considering whether appellant "zealously pursued a speedy trial" as bearing on the reasonableness determination, and finding that this factor weighed in favor of the subsection (h)(7) exclusion in light of the fact that appellant did not seek a severance), cert. denied, — U.S. —, 117 S.Ct. 265, 136 L.Ed.2d 189 (1996); United States v. Tobin, 840 F.2d 867, 870 (11th Cir. 1988) (noting, but not regarding as dispositive, the defendant's failure to move for severance in determining that the eight month time span during which authorities endeavored to apprehend a codefendant constituted a reasonable, and therefore attributable, delay); United States v. Dennis, 737 F.2d 617, 621 (7th Cir.) (stating that "whether delay [is] reasonable will depend on the facts of each case," and considering appellant's failure to move for severance to be a significant fact), cert. denied, 469 U.S. 868, 105 S.Ct. 215, 83 L.Ed.2d 145 (1984).

10

assessing subsection (h)(7) exclusions, electing to gauge the reasonableness of delay on a case by case basis, given the fact-bound nature of the inquiry, and to view a severance request (or the absence thereof) as but one factor to be considered in evaluating challenges to excludable delay attribution under subsection (h)(7).  This approach admits of two inquiries, depending on the nature of the challenge.  The reasonableness of delay can be measured in reference to (a) "the totality of the circumstances prior to trial," or (b) the actual prejudice suffered by the appellant as a result of the subsection (h)(7) exclusion.[19]

Employing the former analysis, the Eleventh Circuit asks whether the delay was necessary to achieve its purpose.[20]  In examining the necessity of the delay, proper consideration should be given to the purpose behind subsection (h)(7) —— "accommodating the efficient use of prosecutorial and judicial resources in trying multiple defendants in a single trial."[21]

---

[19]Tobin, 840 F.2d at 870.

[20]Id.  For example, "a period of delay is reasonable under [subsection (h)(7)] if it appears necessary in order for the trial court to dispose of the underlying motions, 'for the court to conduct previously scheduled trials,' or 'for [codefendants] to obtain new counsel.'" Darby, 744 F.2d at 1518.

[21]Theron, 782 F.2d at 1514.  In United States v. Varella, 692 F.2d 1352 (11th Cir. 1982), cert. denied, 463 U.S. 1210, 103 S.Ct. 3542, 77 L.Ed.2d 1392 (1983), and 464 U.S. 838, 104 S.Ct. 127, 78 L.Ed.2d 124 (1983), the Eleventh Circuit noted the preference for joint trials embodied in the Act.  In denying a challenge to subsection (h)(7) exclusions, the Varella court observed that "[c]ongress recognized the utility of multi-defendant trials to effectuate the prompt efficient disposition of criminal justice.

11

With respect to the prejudice analysis, relevant considerations include whether the delay impaired the appellant's ability to defend himself or resulted in excessive pretrial incarceration.[22] A defendant's failure to move for severance, or otherwise to pursue a speedy trial in the district court, can undermine prejudice allegations made on appeal.[23]

When we apply this methodology to the instant case, Franklin's subsection (h)(7) challenge fails. The delay in bringing Milton to trial was properly excludable from Franklin's seventy-day speedy trial timetable as it was necessary to achieve a joint trial.[24] The utility of a joint trial is particularly compelling here, as the defendants were charged with a single conspiracy so that the government could be expected to "recite a single factual history, put on a single array of evidence, and call a single group of

---

It felt that the efficiency and economy of joint trials far outweighed the desirability of granting a severance where the criterion was simply the passage of time." Id. at 1359. See also Novak, 715 F.2d at 814 (examining the legislative history of subsection (h)(7) and finding "a strong congressional preference for joint trials and an intention that delays resulting from the joinder of codefendants be liberally excluded").

    [22]Tobin, 840 F.2d at 870; Darby, 744 F.2d at 1519.

    [23]See Tobin, 840 F.2d at 870, Olivo, 69 F.3d at 1062, Dennis, 737 F.2d at 621 (all noting as significant the defendant's failure to seek a severance).

    [24]See Tobin, 840 F.2d at 870 (finding that eight-month delay produced by government's unsuccessful attempt to bring a codefendant to trial was reasonable as it was necessary to achieve a joint trial); Dennis, 737 F.2d at 621.

witnesses."[25]  The fact that Franklin's case was set for trial soon after Milton filed his notice of intent to enter a guilty plea does not persuade us that the government disingenuously pursued a joint trial.  Rather, it seems eminently more logical to infer from this sequence of events that the government conscientiously sought to keep its options open, conserving judicial resources by preserving the possibility of a joint trial in the event that plea negotiations with Milton failed.  This conclusion also follows from the diligence with which the government sought Milton's apprehension, to which Franklin stipulated at the hearing on his speedy trial motion.

Franklin's prejudice allegation is equally unpersuasive.  He claims that his extended pretrial incarceration limited his access to counsel — ostensibly establishing that the delay resulting from Milton's apprehension and motion practice impaired Franklin's ability to defend himself — but he offers nothing in support of this bald contention.  To the extent that Franklin relies exclusively on the length of his pretrial incarceration as grounds for prejudice, we believe that any prejudice in this sense was insufficient to render the Milton delay unreasonable,[26] especially in light of the fact that Franklin never sought to sever his case

---

[25]United States v. Mayes, 917 F.2d 457, 460 (10th Cir. 1990) (quoting United States v. Mobile Materials, Inc., 871 F.2d 902, 916 (10th Cir. 1989)), cert. denied, 498 U.S. 1125, 111 S.Ct 1087, 112 L.Ed.2d 1192 (1991).

[26]See Darby, 744 F.2d at 1519.

13

from Milton's.

We conclude that neither the delay in bringing Milton to trial nor the delay occasioned by Milton's motion practice was unreasonable.  The district court did not err in denying Franklin's speedy trial motion as the Milton delays were properly excluded from Franklin's speedy trial period under subsection (h)(7).

Lastly, with respect to the subsection (h)(7) exclusions, Franklin contends that the government and the court effectively severed the cases at the pretrial phase by sealing the Milton proceedings; as those proceedings were sealed, contends Franklin, he had no way of determining whether Milton had (a) made an initial appearance, (b) submitted any pretrial motions, or (c) entered into a plea agreement.  Under such circumstances, he urges, attributing the Milton delays to him would be unfair.

Franklin's argument is unconvincing.  As it stated in its motion to seal the Milton proceedings, the government had a legitimate interest in encouraging Milton's cooperation with law enforcement authorities.  Sealing the proceedings promoted this interest by minimizing the risk that Milton would be threatened, harassed, or otherwise discouraged from assisting in the investigation and prosecution of others.  Although Franklin may have been unaware of the precise movements of his speedy trial clock, he was not rendered helpless to pursue a speedy trial.

B.  MATERIAL VARIANCE

Evidentiary rulings are reviewed for abuse of discretion and

14

may be reversed only if the ruling affects a substantial right of a party.[27]

At Franklin's trial, government witness Paul Ard gave testimony, pursuant to a plea agreement, concerning Franklin's participation in drug transactions that occurred in "late 1992," emanating from the Baton Rouge residence identified in the indictment. Ard testified that he began conducting drug transactions with Milton, Dozier, Harris, and Franklin after Harris asked him about the possibility of selling crack cocaine in St. Tammany Parish. Following that conversation, Ard visited the Baton Rouge residence weekly, obtaining various amounts of crack cocaine —— as much as one kilogram in one visit —— which he would then resell. According to Ard's testimony, Franklin was always present during these visits, typically assisting in the transactions by notifying Harris of Ard's arrival ("paging" Harris), counting the money that would exchange hands, and retrieving the drugs from the area of the house where they were stored. Ard also testified that, on one occasion at another residence, he obtained eighteen ounces of crack cocaine directly from Franklin.

Franklin argues that, in offering Ard's testimony, the government presented the jury with evidence of two distinct conspiracies, at variance with the indictment. Franklin maintains

---

[27]Marcel v. Placid Oil Co., 11 F.3d 563, 566 (5th Cir. 1994).

that, as the indictment charged him with a single drug-trafficking conspiracy beginning "in or before January 1993," Ard's testimony necessarily established a separate conspiracy because it concerned events that took place in 1992.

A reversal based on variance between indictment and proof requires two findings: (1) that the evidence at trial actually proved two separate conspiracies, and (2) that the variance affected a substantial right of the appellant.[28] We need not reach the prejudice inquiry as we conclude that the jury was only presented with proof of a single conspiracy. Ard's testimony merely evidenced his participation in the charged conspiracy. As a distributor in the operation, Ard was a member of the drug-trafficking scheme. All the participants knew one another, shared a common goal, and were jointly involved in the fundamental phases of a single enterprise.[29] Moreover, under the plain language of the indictment, the events recounted by Ard fell within the charged time frame, beginning "in or before" January 1993. The district court did not abuse its discretion in permitting Ard's testimony.

C. SUFFICIENCY OF THE EVIDENCE

In reviewing an insufficiency claim, we determine whether, based on the totality of the evidence at trial, any rational trier of fact could have found that the government proved the essential

---

[28]United States v. Winship, 724 F.2d 1116, 1122 (5th Cir. 1984).

[29]See id. at 1123.

16

elements of the crimes charged, beyond a reasonable doubt.[30]  In so doing, we view the evidence in the light most favorable to the verdict.[31]

Franklin argues that the district court erred in denying his FED. R. CRIM. P. 29 motion for judgment of acquittal, as the evidence adduced at trial was insufficient to support his conspiracy and distribution convictions under counts one and five of the indictment, respectively.  Franklin's contention lacks merit.  Our review of the record reveals substantial evidence demonstrating Franklin's involvement in the conspiracy charged in count one.

The record likewise contains sufficient evidence linking Franklin to the distribution offense charged in count five.  That count is based on the CI's 10.3-gram crack cocaine purchase, conducted at the Baton Rouge residence on August 12, 1994.  Even though the CI testified that he obtained the drugs from Dozier and that he could not recall seeing anyone else at the residence that day, he also stated that he initiated the transaction by contacting Franklin who then arranged the exchange.  Moreover, the court instructed the jury on the broad reach of coconspirator liability.[32]

---

[30]United States v. Davis, 61 F.3d 291, 296 (5th Cir. 1995), cert. denied, 516 U.S. 1135, 116 S.Ct. 961, 133 L.Ed.2d 883 (1996).

[31]Id.

[32]See United States v. Wilson, 105 F.3d 219, 221 (5th Cir.) ("It is well-settled that a party to a conspiracy may be held liable for the substantive offenses of a co-conspirator as long as the acts were reasonably foreseeable and done in furtherance of the conspiracy regardless of whether he had knowledge of or

17

The district court did not err in denying Franklin's FED. R. CRIM. P. 29 motion.

D. PUTATIVE SENTENCING ERROR

We review factual findings made by a district court for sentencing purposes under the clearly erroneous standard, and review the district court's legal application of the United States Sentencing Guidelines ("the Guidelines") de novo.[33]

Paragraph nine of the PSR credited Franklin with the distribution of 1,637.87 grams of crack cocaine, bringing the total weight of the drugs for which he was responsible to 1,662 grams, and increasing his base offense level under section 2D1.1(a)(3) of the Guidelines from 28 to 38.[34] The information on which the paragraph nine amounts were based was supplied by Ard, in an interview conducted pursuant to the presentence investigation on November 18, 1996. During this interview, Ard described the same transactions to which he had testified at trial, noting Franklin's participation and the amount of crack cocaine involved in each.

Franklin argues that paragraph nine quantities should not have

_____

participated in the substantive acts."), cert. denied, —— U.S. ——, 118 S.Ct. 133, 139 L.Ed.2d 82 (1997).

[33]United States v. Asibor, 109 F.3d 1023, 1040 (5th Cir.), cert. denied, —— U.S. ——, 118 S.Ct. 254, 139 L.Ed.2d 182 (1997), and —— U.S. ——, 118 S.Ct. 638, 139 L.Ed.2d 617 (1997).

[34]U.S. SENTENCING GUIDELINES MANUAL § 2D1.1 (a)(3) (1997) [hereinafter U.S.S.G.]. The Guidelines that are in effect on the date the defendant is sentenced determine the sentence to be imposed. 18 U.S.C. § 3553(a)(4) (1994). Franklin was sentenced in March of 1997.

been considered in assessing his base offense level, as those quantities lack "sufficient indicia of reliability."[35]  In support of his position, Franklin observes that paragraph nine is predicated on the "highly suspect" account of a convicted drug dealer who could have exaggerated Franklin's involvement in the hope of garnering more favorable treatment from law enforcement officials.  Moreover, maintains Franklin, Ard's account is not substantiated by scientific analysis or physical evidence (of drugs or drug money), and it described events (a) occurring almost five years prior to sentencing (b) in which Franklin was "merely present."

Franklin's contentions are not well taken.  Comment 12 to section 2D1.1 makes it clear that neither physical evidence nor scientific analysis of the drugs involved in a given offense is required in determining the quantity to be used in setting a defendant's base offense level.  This commentary authorizes the court to approximate the quantity of drugs involved when there is no drug seizure.[36]  The court's approximation must simply bear "sufficient indicia of reliability to support its probable

---

[35]Franklin also challenges paragraph nine on the ground that the information provided by Ard and embodied in that paragraph concerned events predating the conspiracy charged in the indictment.  We need not address this argument as it has been disposed of in our rejection of Franklin's material variance claim.

[36]See U.S.S.G. § 2D1.1, cmt. 12 ("Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance.").

accuracy."[37]  PSRs are presumptively reliable.[38]  Absent rebuttal evidence demonstrating inaccuracy, which evidence the defendant bears the burden of producing, district courts are entitled to rely on PSRs.[39]

Franklin has failed to produce competent evidence of paragraph nine's inaccuracy.  His conjectural assertions regarding Ard's potential motives are insufficient to rebut the PSR's presumptive reliability, especially considering the fact that the jury credited Ard's testimony —— the selfsame information on which paragraph nine is based —— in convicting Franklin on all counts.  With respect to his "mere presence" contention, we remind Franklin that the drugs used in calculating a defendant's base offense level include both those drugs in the distribution of which he was directly involved, and those drugs foreseeably distributed in furtherance of the conspiracy.[40]

Franklin next challenges the court's assessment of a two point

---

[37]See U.S.S.G. § 6A1.1(a).

[38]United States v. Patten, 40 F.3d 774, 777 (5th Cir. 1994), cert. denied, 515 U.S. 1132, 115 S.Ct. 2558, 132 L.Ed.2d 811 (1995).

[39]Id.

[40]See U.S.S.G. § 1B1.3(a)(1)(B); United States v. Leal, 74 F.3d 600, 607 (5th Cir. 1996) (noting that the quantity of drugs involved in an offense includes "both drugs with which the defendant was directly involved, and drugs that can be attributed to the defendant in a conspiracy as part of his 'relevant conduct' under section 1B1.3(a)(1)(B) of the Guidelines.") (citing United States v. Carreon, 11 F.3d 1225, 1230 (5th Cir. 1994)).

20

firearm possession enhancement under section 2D1.1(b)(1) of the Guidelines.[41] The only evidence that he possessed a dangerous weapon during the drug-trafficking venture, contends Franklin, is found in Ard's statement to the investigating probation officer. Franklin suggests that the information provided by Ard pursuant to the presentence investigation cannot provide the foundation for a section 2D1.1(b)(1) enhancement as that information does not indicate whether Franklin had knowledge of the firearms or whether they were operable.

We need not belabor this point, as Franklin's arguments are meritless, and ample evidence exists in the record supporting the firearm possession enhancement. Ard testified at trial that he routinely saw Franklin carrying a pistol in his waistband, that he had seen firearms strewn about the Baton Rouge residence, and that Harris and Franklin had, on one occasion, proudly displayed recently purchased firearms at the residence. Firearm inoperability does not preclude section 2D1.1(b)(1)'s application.[42]

Franklin also contends that he was entitled to an offense level reduction under section 3B1.2 of the Guidelines for his mitigating role in the drug-trafficking venture as a minimal or, in the alternative, minor participant.[43] He claims that there is no

---

[41]U.S.S.G. § 2D1.1(b)(1).

[42]United States v. Paulk, 917 F.2d 879, 882 (5th Cir. 1990).

[43]U.S.S.G. § 3B1.2.

evidence indicating that he profited substantially from the drug transactions or that he was anything other than peripherally involved in the alleged activities. Again, we need not belabor this point as ample evidence was adduced at trial demonstrating that Franklin played a significant role, if not an integral one, in the conspiracy. We cannot say that the district court clearly erred in determining that Franklin was not "substantially less culpable than the average defendant."[44]

Finally, Franklin challenges the manner in which the district court calculated his criminal history score. The court assessed two criminal history points under section 4A1.1(d) of the Guidelines because Franklin was on probation for a state court burglary conviction while he participated in the drug-trafficking conspiracy.[45] The court also assessed three criminal history points under section 4A1.1(a) of the Guidelines because, following Franklin's federal conviction, the state court revoked his probation and reinstated his sentence on the burglary conviction.[46]

Franklin argues that the three point enhancement for his prior sentence was erroneous because that sentence was originally suspended, and his conviction for the instant federal offense was

---

[44]United States v. Brown, 54 F.3d 234, 241 (5th Cir. 1995) ("A downward adjustment under section 3B1.2 is generally appropriate only where a defendant was 'substantially less culpable than the average participant.'") (citations omitted).

[45]U.S.S.G. § 4A1.1(d).

[46]U.S.S.G. § 4A1.1(a).

22

the sole reason for that suspension's withdrawal.  Because the conduct supporting the criminal conviction in this case is the same conduct that produced the state probation revocation, he maintains, a criminal history assessment for that revocation constitutes unauthorized double counting —— two or more upward adjustments premised on the same conduct.

We are not convinced that the federal offense conduct and the conduct resulting in the probation revocation are the same. Franklin's probation was revoked for violating the conditions of his probation, not for his instant conviction; there is no evidence that the revocation turned solely on Franklin's federal conviction.[47]  As such, double counting cannot be inferred.  And, more importantly, even if it could, "double counting is legitimate where a single act is relevant to two dimensions of the Guideline analysis."[48]

---

[47]The PSR indicates that Franklin's probation officer for the state burglary conviction had taken revocatory action dating back to July 27, 1994, when he filed an affidavit with the state court alleging that Franklin had violated conditions of his probation by: (1) failing to report as instructed; (2) failing to submit monthly supervision reports; (3) failing to pay restitution; and (4) failing to obtain substance abuse evaluation.  A revocation hearing was set for August 25, 1994, but Franklin failed to appear at the hearing.  A warrant was issued on December 13, 1994, and Franklin was arrested on March 27, 1996 by federal law enforcement officials.  A probation revocation hearing was held on November 12, 1996, following Franklin's conviction in federal court.  The transcript of that hearing reveals that Franklin's probation was revoked based on his acknowledgment of the violations noted above.

[48]United States v. King, 981 F.2d 790, 796 (5th Cir.) (quoting United States v. Campbell, 967 F.2d 20, 25 (2d Cir. 1992)), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993).  As

III

CONCLUSION

For the foregoing reasons, the judgment of the district court is, in all respects,

AFFIRMED.

---

the King court noted:

> [I]t may be appropriate to count a single factor both in assessing the defendant's criminal history category and in calculating the applicable offense level since the two measure different things.  The offense level represents a judgment as to the wrongfulness of the particular act.  The criminal history category principally estimates the likelihood of recidivism.

Id. (quoting Campbell, 967 F.2d at 24) (citations omitted).