**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Howard MESSER, Defendant– Appellant.**

**United States of America, Plaintiff–Appellee,**

v.

**Patrick A. Masino, Defendant– Appellant.**

United States of America,
Plaintiff–Appellee,

v.

Vahan Khachatrian, Defendant–
Appellant.

Nos. 96–50493, 96–50500, 96–50544.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 27, 1999

Filed Dec. 14, 1999

Paul L. Hoffman, Bostwick & Hoffman, Santa Monica, California, for defendant-appellant Howard Messer.

Mona C. Soo Hoo, Los Angeles, California, for defendant-appellant Patrick A. Masino.

Thomas L. Fox, Encino, California, for defendant-appellant Vahan Khachatrian.

Paul J. Watford, Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellee.

Before: FERGUSON, O'SCANNLAIN, and TASHIMA, Circuit Judges.

TASHIMA, Circuit Judge:

On December 18, 1991, Patrick Masino, Howard Messer, and Vahan Khachatrian (collectively "Appellants") were indicted for conspiracy to commit money laundering in violation of 18 U.S.C. § 371 and money laundering in violation of 18 U.S.C. § 1957.[1] Stephen Saccoccia was indicted pursuant to 18 U.S.C. §§ 2, 1957 for aiding and abetting the money laundering. Appellants were arraigned soon thereafter, but Saccoccia remained at large as a fugitive in Switzerland. He was extradited after a number of months to Rhode Island to stand trial on related charges. Due to the delay, the district court eventually severed Saccoccia's trial from Appellants' trial. Appellants' trial began on September 8, 1993, approximately 21 months after they had been arraigned. They were convicted on all counts and now appeal, con-

tending, among other things, that the delay in bringing them to trial violated the Speedy Trial Act, 18 U.S.C. §§ 3161–3174, and that there is insufficient evidence to support their convictions. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we conclude that the Speedy Trial Act was violated. We therefore reverse Appellants' convictions, vacate their sentences, and remand these cases for further proceedings consistent with this opinion.

I.

Appellants were participants in the precious metals business in Los Angeles; Masino managed the affairs of International Metal Management ("IMM"), Messer managed Clinton Import/Export Corporation ("CIE"), and Khachatrian owned and managed Real Gold Enterprises ("RGE"). The government alleged that Appellants, under the guise of their businesses, were deeply involved in the west coast operations of a large money-laundering organization that was controlled by Saccoccia and laundered funds for Columbian drug traffickers. According to the government, affiliates of Saccoccia would collect cash in New York City and ship it to one of Appellants' three companies. Affiliates also collected cash in Los Angeles for delivery to Appellants. Appellants would then convert the cash into funds that could be transferred by wire to Saccoccia's Rhode Island company, Trend Precious Metals, or to foreign bank accounts.

Messer and Khachatrian were arrested and appeared in court on November 25, 1991. Masino was arrested and appeared in court four days later. On December 18, 1991, they were indicted in the United States District Court for the Central District of California on one count of conspiracy to commit money laundering and numerous counts of money laundering. Saccoccia was named as an unindicted co-conspirator with respect to the conspiracy count and as an aider and abettor with

---

1. The government also sought the forfeiture of property pursuant to 18 U.S.C. § 982.

respect to most of the money laundering counts. The indictment also alleged a forfeiture count against all defendants. Appellants were arraigned on December 23, 1991, and the district court set February 11, 1992, as the date for the commencement of trial. Over the course of the next 21 months, however, the trial was continued five times.

The first continuance occurred in February, 1992. In light of an agreement between Appellants and the government that the case's substantive and factual complexity warranted continuing the trial, the district court set a new trial date of April 7, 1992. The district court found the time from February 3, 1992, to April 7, 1992, to be excludable from the time period within which the Speedy Trial Act requires that a trial commence, on the basis of the case's complexity. *See* 18 U.S.C. § 3161(h)(8)(A), (B)(ii). Appellants do not contest the propriety of this continuance.

In March, 1992, the government moved for a second continuance due to: (1) the case's complexity; (2) Saccoccia's unavailability for trial while he contested his extradition from Switzerland; and (3) the government's need to obtain evidence from foreign countries. Appellants opposed the motion on the grounds that the government had not been diligent in investigating the case and that it was unlikely that Saccoccia would ever be tried in California. The district court granted the motion, finding the additional time excludable under § 3161(h)(8)(A) and (B)(ii) due to the case's complexity, 18 U.S.C. § 3161(h)(7) [2] due to Saccoccia's unavailability, and 18 U.S.C. § 3161(h)(9) [3] due to the request for evidence in a foreign country. The district court reset the trial date for September 15, 1992.

Saccoccia was extradited to the United States in late June, 1992. Instead of bringing him to California, however, the government brought Saccoccia to Rhode Island. There he was arraigned on separate charges for, among other things, violations of the RICO and money laundering statutes. The government decided to try Saccoccia in Rhode Island first in a trial expected to begin on October 5, 1992, and to last six to eight weeks.[4]

As a result, the government requested a third continuance until February 9, 1993. In addition to the decision to try Saccoccia first in Rhode Island, the government cited as grounds the complexity of the case and the existence of outstanding requests for evidence in foreign countries. The Appellants opposed the motion but acknowledged that in light of the district court's prior rulings with respect to Saccoccia, a continuance was in order. The district court granted the government's motion and set a new trial date of February 9, 1993. The court again excluded the intervening time on the grounds of Saccoccia's unavailability, the complexity of the case, and the requests for evidence in foreign countries.

In Rhode Island, Saccoccia's trial ended in a mistrial due to the health of his attorney. The district court in Rhode Island requested that Saccoccia remain there pending retrial scheduled for mid-February, 1993. As a result, on December 10, 1992, the government requested a fourth continuance. The government once again cited the complexity of the case and the outstanding requests for evidence in foreign countries as additional grounds. Ap-

---

2. Section 3161(h)(7) excludes "[a] reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted."

3. Section 3161(h)(9) excludes delays of up to one year if an official request for evidence in a foreign country has been made.

4. The government decided to try Saccoccia first in Rhode Island because he was indicted there first, he had been extradited there, he had already been arraigned there, he was incarcerated there, and three of his codefendants in that case were in custody pending trial.

pellants continued to oppose any continuances on the grounds discussed at the March, 1992, hearing, but that they recognized that the reasons the district court gave then for continuing the trial still applied. The district court continued the trial to May 18, 1993, excluding the time in the interim on the basis of Saccoccia's unavailability, the case's complexity, and the outstanding requests for evidence in foreign countries.

In March, 1993, Saccoccia was convicted and sentenced to 660 years' imprisonment in the Rhode Island case. *See United States v. Saccoccia,* 58 F.3d 754, 762 (1st Cir.1995). On April 13, 1993, he was finally arraigned in the district court in California. To allow Saccoccia time to retain counsel and prepare for trial, the district court postponed the trial a fifth time, until September 7, 1993. The district court cited the need to wait for Saccoccia and the case's complexity as grounds for excluding the delay. Once again, Appellants reiterated their objection to having to wait for Saccoccia but noted that they recognized that he needed time to prepare for trial.

On June 21, 1993, Appellants filed a motion to dismiss the indictment on the ground that the delay in bringing them to trial violated the Speedy Trial Act. They contended that by April 7, 1992, the government had enough time to review the evidence to go to trial; that the government had not demonstrated how the foreign evidence it sought was relevant to the case, and in any event, delay for such purposes is limited to one year. Most importantly, Appellants contended that the time spent waiting for Saccoccia was unreasonable, in contravention of § 3161(h)(7). The district court denied the motion. With respect to the first argument, the district court concluded that the exclusion of time until September 15, 1992, was justified by the complexity of the case but that "this grounds [sic.] for continuance became less tenable" after that date.

The district court likewise acknowledged that the exclusions based on requests for evidence in foreign countries should have ended after one year, on April 7, 1993. The district court concluded, however, that the delay in waiting for Saccoccia was neither unreasonable nor unjustified in light of the strong interest in trying codefendants together. Further, the district court noted that the government had not misled the court as to the necessity of trying Saccoccia with Appellants, and that much of the delay had been beyond the control and foreseeability of the government. Finally, the court noted that the Appellants had been free on bond in the interim and had never filed a motion for severance.

Notwithstanding this ruling, on August 27, 1993, the district court severed Saccoccia's trial from Appellants' trial after Saccoccia requested additional time to prepare for trial.[5] Appellants were finally brought to trial on September 8, 1993. After the close of the prosecution's case and at the close of all evidence, Appellants moved for judgments of acquittal. On December 20, 1993, the jury returned guilty verdicts against all three Appellants.

In July, 1994, Appellants renewed their motion to dismiss pursuant to the Speedy Trial Act, and the district court rejected their motion on the grounds expressed in the court's previous orders. Appellants renewed this motion again on March 24, 1995, and January 17, 1996. On July 15, 1996, the district court once again denied these motions. The court noted that "Defendants clearly objected, both in oral arguments and in noticed motions, to the repeated continuances of trial," but found the delay to be reasonable in light of the interest in joint trials, Appellants' belated assertion of prejudice, and the fact that they were free on bond pending trial. The district court did, however, express its concern over the delay:

**5.** The government ultimately dismissed the indictment against Saccoccia. As of the date of

oral argument, he has not been reindicted on these charges.

While the Court believes that certain circumstances responsible for the continuances were beyond the control of the Government, the Government's subsequent conduct belies its assertion that Saccoccia's presence was necessary before trial in this Court could begin.... [T]he eventual dismissal of the indictment against Saccoccia indicates to the Court that the purported necessity of Saccoccia to this trial was indeed not a necessity....

The Court believes that the circumstances of this case—including the Government's repeated representations to the Court with respect to the necessity of delaying the trial against Defendants until Saccoccia was available, the Court's earlier expressed concerns regarding each newly-sought delay, and the eventual dismissal of Saccoccia's indictment—*raise serious questions about the reasonableness of the delay.* The Court is also concerned that control over the prosecution of this case was unduly and improperly influenced by the concerns of prosecutors in the Rhode Island trial. However, the mere fact that subsequent events bore out the truth of defense counsel's predictions does not in itself necessarily indicate that the Government planned such events or that the delay was necessarily unreasonable.

Order Re: Defendants' Renewed Motion to Dismiss the Indictment at 7–8 (Jul. 15, 1996) (footnote omitted) (emphasis added).

In August, 1996, Masino and Messer were sentenced to 132 months' imprisonment, and Khachatrian received a sentence of 78 months. They now appeal, raising numerous issues in addition to the asserted violation of the Speedy Trial Act.[6]

## II.

The Speedy Trial Act requires that a defendant's trial commence within 70 days

of the later of the filing of an indictment or the defendant's first appearance before the court in which charges are pending. *See* 18 U.S.C. § 3161(c)(1). If a defendant's trial does not begin within the requisite time period and the defendant moves for dismissal prior to trial, the court must dismiss the indictment. *See* 18 U.S.C. § 3162(a)(2). This rule is tempered by the Speedy Trial Act's exclusion of certain periods of time from the 70–day calculation. *See United States v. Hall,* 181 F.3d 1057, 1060 (9th Cir.1999). For example, the Speedy Trial Act excludes delays resulting from pretrial motions, *see* 18 U.S.C. § 3161(h)(1)(F), delays resulting from the unavailability of the defendant, *see* 18 U.S.C. § 3161(h)(3)(A), or reasonable delays resulting from the joinder of a defendant with a codefendant whose 70–day period has yet to run, *see* § 3161(h)(7).

We review questions of law with respect to the Speedy Trial Act de novo. *See Hall,* 181 F.3d at 1061. The district court's factual findings are reviewed for clear error. *See United States v. Butz,* 982 F.2d 1378, 1380 (9th Cir.1993).

It is well established that an exclusion from the Speedy Trial clock for one defendant applies to all codefendants. *See id.* at 1381. The attribution of delay to a codefendant, however, is limited by a reasonableness requirement; § 3161(h)(7) excludes from the 70–day period "[a] reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." Appellants do not dispute that the time at issue was excludable with respect to Saccoccia. Instead, the issue is whether the resulting delay to the Appellants was reasonable.[7]

---

**6.** Because we conclude that the Speedy Trial Act was violated, we reach only the sufficiency of the evidence, an issue that implicates whether Appellants may be subjected to a retrial.

**7.** Because Appellants appeared before the court prior to their indictment, the 70–day period commenced on December 19, 1991, the day after they were indicted. *See United States v. Wirsing,* 867 F.2d 1227, 1229–30 (9th

We explored for the first time the test for determining whether a delay was reasonable in our recent decision in *Hall*. *See* 181 F.3d at 1062. We concluded that "[t]he most common approach among the other circuits is to 'gauge the reasonableness of delay on a case by case basis, given the fact-bound nature of the inquiry,'" and we applied the approach set forth by the Fifth Circuit. *Id.* (quoting *United States v. Franklin*, 148 F.3d 451, 457 (5th Cir. 1998)).

In *Franklin*, the Fifth Circuit rejected the approach taken by the Second and Sixth Circuits that requires a defendant to have moved for severance in order to challenge the reasonableness of the delay. *See* 148 F.3d at 456–57. Instead, the court adopted what it considered to be the "more common approach" of the Eleventh Circuit under which a motion for severance is only one factor to be considered. *Id.* This approach measures reasonableness on a case by case basis and "admits of two inquiries, depending on the nature of the challenge. The reasonableness of delay can be measured in reference to (a) 'the totality of the circumstances prior to trial,' or (b) the actual prejudice suffered by the appellant as a result of the [§ 3161(h)(7)] exclusion." *Id.* at 457 (quoting *United States v. Tobin*, 840 F.2d 867, 870 (11th Cir.1988)); *see also United States v. Olivo*, 69 F.3d 1057, 1061 (10th Cir.1995) (noting that reasonableness is assessed in terms of the "relevant circumstances"), *amended by* 80 F.3d 1466 (10th Cir.1996); *United States v. Davenport*, 935 F.2d 1223, 1236 (11th Cir.1991) (noting that reasonableness "can be determined by reference to the totality of the circumstances prior to trial, by the extent to which the appellant's defense was prejudiced, or by the sheer length of the delay"); *United States v. Dennis*, 737 F.2d 617, 621 (7th Cir.1984) (noting that reasonableness is determined according to the facts of each case).

In *Hall*, we stated that "[i]n undertaking such analyses, courts look particularly to 'whether the delay was necessary to achieve its purpose' and to whether there was any 'actual prejudice suffered by the appellant.'" 181 F.3d at 1062 (quoting *Franklin*, 148 F.3d at 457). A cursory reading of our discussion might suggest that a defendant must demonstrate *both* that the delay was not necessary to achieve § 3161(h)(7)'s purpose *and* that the defendant suffered actual prejudice in order to show that a delay was unreasonable. The *Hall* decision does not require this interpretation, however, because we noted that these considerations are merely factors to be emphasized. *See id.* In fact, such a requirement would contravene the discussion in *Hall* as to the purposes behind the Speedy Trial Act; Congress intended the rights provided to protect not only the defendant's interest in a prompt trial but the public's interest as well. *See id.* at 1061–62. Citing the House Judiciary Committee's report on the Speedy Trial Act, we wrote:

> "[T]he right to a speedy trial belongs not only to the defendant, but to society as well." ... Accordingly, regardless of the willingness of counsel to accept pretrial delay, the Speedy Trial Act assigns district courts an independent responsibility to protect both the defendant's and the public's strong interest in the timely administration of justice.

*Id.* (citation omitted). An inquiry that looks only to whether the delay was necessary to achieve § 3161(h)(7)'s purpose of effectuating joint trials may give short shrift to the defendant's interest in not being prejudiced in the presentation of his defense. On the flip side, an inquiry that considers solely whether the defendant was prejudiced by the delay does little to protect the public's interest in, for example, avoiding the delegitimizing effect of drawn-out legal proceedings.

---

Cir.1989). Approximately 44 days expired by the time the district court granted the first continuance. Therefore, after the first continuance, 26 nonexcludable days remained before the Speedy Trial Act deadline.

Further, *Hall* does not foreclose the consideration of other factors. Thus, a court may consider, for example, whether "the sheer length of the delay" was so egregious as to call into question its reasonableness. *Davenport*, 935 F.2d at 1236. Another consideration may be the defendant's failure to move to sever his case from that of his codefendant or otherwise to assert his speedy trial rights. *See, e.g., Hall*, 181 F.3d at 1063 (considering suggestion of severance as part of the prejudice analysis); *Franklin*, 148 F.3d at 457; *Dennis*, 737 F.2d at 621. Yet another consideration may be whether the defendant was free on bond during the delay. *See Olivo*, 69 F.3d at 1062. In sum, the proper test is whether the totality of the circumstances warrants a conclusion that the delay was unreasonable.[8]

■ Considering all of the relevant circumstances, we conclude that the delay resulting from the decision to wait for Saccoccia after it had become apparent that the government had decided to try him first in Rhode Island was unreasonable.[9] We begin, as we did in *Hall*, by considering whether the delay was necessary to effectuate the purpose of § 3161(h)(7) "to facilitate the efficient use of judicial resources by enabling joint trials where appropriate." *Hall*, 181 F.3d at 1062.

On the one hand, the delay in this case was necessary to preserve the possibility of a joint trial. On the other hand, the fact that Saccoccia was to be tried first on more serious charges in Rhode Island decreased the chance that he would ever be tried in California. In the California case, Saccoccia was named only as an unindicted co-conspirator and as an aider and abettor. In Rhode Island, Saccoccia was charged with racketeering and money laundering arising from his leadership of an organization alleged to have laundered over $100 million in drug proceeds. *See Saccoccia*, 58 F.3d at 762. Although the government could not have known that Saccoccia would receive a 660–year sentence in Rhode Island, there was a high probability that a very lengthy sentence would be imposed, if he were convicted. Messer's attorney anticipated the possibility that Saccoccia would never be tried in California when he suggested to the district court that it would not have to try Saccoccia separately from Appellants because he would receive a substantial sentence in Rhode Island. In sum, although there was a significant interest in trying Appellants along with Saccoccia, the decision to try Saccoccia first in Rhode Island, in conjunction with the seriousness of the charges he faced there, strongly suggested that he would not be available for trial for a significant length of time, if he was tried a second time at all. Therefore, because the reality of the situation was such that the delay did not increase the likelihood of a joint trial, we conclude that this factor weighs in favor of finding the delay unreasonable.

The sheer length of the delay and Appellants' consistent assertions of their right to a speedy trial also weigh in favor of finding the delay unreasonable. Almost 21 months elapsed from Appellants' indictment to the commencement of their trial. Putting aside the time that was excludable

---

8. As recognized in *Franklin*, a defendant may establish the unreasonableness of a delay solely on the basis of prejudice or a disconnection between the delay and § 3161(h)(7)'s purpose. *See Franklin*, 148 F.3d at 457 (treating inquiries into the totality of the circumstances and prejudice as distinct inquiries); *Tobin*, 840 F.2d at 870 (same). Likewise, it is possible that a delay could be so long as to be per se unreasonable. *See Davenport*, 935 F.2d at 1236 (noting that "sheer length of the delay" may constitute unreasonableness).

9. Because the district court had already continued the trial date until September 15, 1992, when it became apparent that Saccoccia was to be tried first in Rhode Island, we will use this date as the beginning of the period of time we find nonexcludable. We do not express an opinion as to the propriety of the time the district court found excludable prior to September 15, 1992, because the year-long delay from September 15, 1992, until September 8, 1993, exceeds the Speedy Trial Act's limits by a wide margin.

on other grounds, there still remains an entire year that the district court found excludable under § 3161(h)(7) for the purpose of waiting for Saccoccia.[10]

■ The one-year delay far exceeded the 70–day period within which Congress determined that criminal trials should commence. We have not found, nor have the parties cited, any case in which a court upheld a comparable delay that could not be meaningfully distinguished from the case at hand. The Second Circuit found a 22–month delay to be reasonable in *United States v. Vasquez*, 918 F.2d 329 (2d Cir. 1990). There, the court held that even if the defendant had moved to sever so that he could challenge the reasonableness of the delay under that circuit's law, the delay was reasonable because the defendant "not only waited almost 22 months before alleging a violation of his speedy trial rights or alternatively seeking a severance, but he also affirmatively indicated during much of this period that he was willing to countenance extensive pretrial delays." *Id.* at 337. Therefore, we can distinguish *Vasquez* on the ground that Appellants here have consistently asserted their speedy trial rights throughout the pretrial proceedings.[11] In *Tobin*, the Eleventh

Circuit found reasonable an eight-month delay resulting from the government's inability to arrest the codefendant. *See* 840 F.2d at 869–70. After eight months, the court transferred the absent codefendant to fugitive status and tried the defendant separately. *See id.* at 868. In Appellants' case, in contrast, the year-long delay followed on the heels of other significant delays; common sense dictates that a delay that is reasonable in the abstract may be rendered unreasonable by what preceded it.[12] Therefore, we conclude that the length of the delay, coupled with Appellants' consistent invocations of their right to a speedy trial, weighs in favor of finding a violation of the Speedy Trial Act from the year-long delay.

Finally, we consider whether Appellants were prejudiced by the delay.[13] The best prejudice argument Appellants put forth was that an important witness had died in August, 1993, a month prior to trial. Masino and Khachatrian submitted affidavits attesting that they would have presented Noric Aghabegian as a witness. They claimed that Aghabegian would have testified that he was present in the RGE office on a daily basis from Fall, 1990, to November, 1991, that he helped Khachatrian

---

**10.** The government concedes that the only issue before us is whether the one-year delay was reasonable under § 3161(h)(7). Therefore, we express no opinion as to whether this time was excludable on the other grounds cited by the district court.

**11.** The government also relies on *United States v. Salerno*, 108 F.3d 730 (7th Cir.), *cert. denied*, 521 U.S. 1122, 117 S.Ct. 2517, 138 L.Ed.2d 1018 (1997), in which the Seventh Circuit upheld a delay of 17 months between the end of the defendant's first trial and the government's announcement that it would retry the defendant. *See id.* at 738. The delay was the result of complex post-trial and sentencing motions on the part of the co-defendants. *See id.* at 735. Only Salerno was ultimately retried. *See id.* As in *Vasquez*, however, the defendant in *Salerno* did not raise an objection on the basis of the Speedy Trial Act until *after* the court's resolution of the complicated motions and sentencing proceedings. *See id.*

**12.** It may be argued, as does the dissent, that the way to proceed in this case is to parse the delay into five blocks of time corresponding to the five continuances and determine whether the district court was justified in granting each continuance. This approach is sensible when exclusions other than § 3161(h)(7) are at issue because they do not have a reasonableness requirement; for such exclusions, it is necessary only to provide a justification for the particular delays in question. When the delay must be *reasonable*, however, the reasonableness inquiry would be reduced to little consequence if the context in which the delay occurred were considered irrelevant.

**13.** The district court noted that the defendants did not allege prejudice until May, 1996. Before our decision in *Hall*, however, it was an open question in this circuit whether prejudice was a factor to be considered when assessing claims under the Speedy Trial Act. Therefore, we consider Appellants' tardy assertion of prejudice.

structure his business, and that he participated with Masino and Khachatrian in various legitimate business ventures. Aghabegian would have further testified that he was aware of Khachatrian's arrangement according to which Saccoccia supplied RGE with gold,[14] and that he had not witnessed any money laundering activities at RGE. In light of these affidavits, we conclude that Appellants were prejudiced by the delay. Aghabegian would have provided useful testimony on behalf of Masino and Khachatrian, and it may be inferred that Messer would have also benefitted because the jury could surmise that if RGE was a legitimate enterprise, so too was Messer's enterprise.

■ In *Hall*, we found the prejudice analysis to be informed by whether the defendant moved to sever his trial from that of his codefendant. *See* 181 F.3d at 1063. As discussed above, in *Hall*, we implicitly rejected the notion that a defendant must have filed a motion to sever in order to contest the reasonableness of the delay. We now reject such a requirement explicitly. Instead, we conclude that whether a defendant moved for a severance is one factor to be weighed in determining whether the delay was prejudicial.

Appellants in this case never made a motion to sever. However, as the district court noted in its July 15, 1996, order denying Appellants' renewed motion to dismiss the indictment, Appellants objected to each of the four contested continuances. Implicit in these objections was the claim that Appellants did not want to be tried along with Saccoccia; instead, they valued their right to a speedy trial more than any benefit they may have derived from a joint trial. Thus, this is a not a case in which the district court was unaware of the defendants' desire to exercise their speedy trial right or of the basis for the defendants' speedy trial objection. The fact that the district court ultimately severed Saccoccia's trial *sua sponte* indicates that the court was aware of Appel-

lants' concerns. A motion to sever would have been a mere formality. Therefore, in the circumstances of this case, Appellants' failure to move to sever in this case does not weigh against finding that they were prejudiced by the delay.

Weighing against this showing of prejudice is the fact that Appellants were released on bond by late February, 1992. Although a defendant released pending trial suffers indignities of his own, a number of circuits have recognized that the fact that the defendant is not incarcerated weighs against a finding of prejudice. *See Franklin*, 148 F.3d at 457; *Salerno*, 108 F.3d at 738. We are left, then, with Appellants' allegations with respect to Aghabegian and the fact that Appellants had been released on bond pending trial. Because the fact that the delay " 'impaired [their] defense at trial,' " *Hall*, 181 F.3d at 1062 (quoting *United States v. Darby*, 744 F.2d 1508, 1519 (11th Cir.1984)), outweighs the fact that they had been released on bond pending trial, we conclude that Appellants have made a showing of prejudice.

■ We therefore conclude that under the totality of the circumstances, it was unreasonable to delay Appellants' trial from September 15, 1992, until September 8, 1993. The district court should have severed Saccoccia's trial once it became apparent to the court that Saccoccia was going to be tried first in Rhode Island. Because this nonexcludable delay far exceeds what was left on Appellants' Speedy Trial clock, we conclude that Appellants' right to a speedy trial was violated. Therefore, Appellants' convictions must be reversed, their sentences must be vacated, and the indictment against them must be dismissed. *See* § 3162(a)(2); *Hall*, 181 F.3d at 1063. Whether the government may reindict Appellants depends on whether the indictment should be dismissed with or without prejudice, a determination to be made by the trial court in the first instance. *See id.* ("[O]ur usual

---

14. *See* Part III.B, *infra*.

practice is to remand to allow the district court to decide in the first instance the type of dismissal that is appropriate.") (quoting *United States v. Lloyd,* 125 F.3d 1263, 1271 (9th Cir.1997)). Because a defendant may not be retried under the Double Jeopardy Clause if the evidence against him is insufficient to support a conviction, *see United States v. Tertrou,* 742 F.2d 538, 540 & n. 2 (9th Cir.1984), we are required to review Appellants' challenges to the sufficiency of the evidence.

### III.

■ Appellants were convicted of money laundering in violation of 18 U.S.C. § 1957, and conspiracy to launder money in violation of 18 U.S.C. § 371. To prove a conviction under § 1957, the government must establish that Appellants: (1) knowingly engaged in a financial transaction; (2) knew that the transaction involved criminal property; (3) the property's value exceeded $10,000; and (4) the property was in fact derived from a specified unlawful activity. *See* § 1957(a); *United States v. Turman,* 122 F.3d 1167, 1169 (9th Cir. 1997). Appellants contest the sufficiency of the evidence with respect to the second and fourth elements.

■ To prove a conviction for conspiracy, the government must establish that Appellants " 'had *knowledge* of the conspiracy and acted in furtherance of it.' " *United States v. Wiseman,* 25 F.3d 862, 865 (9th Cir.1994) (quoting *United States v. Bautista–Avila,* 6 F.3d 1360, 1362 (9th Cir.1993)). Where, however, "there is evidence establishing the existence of a conspiracy, if the government is able to establish even a slight connection with the conspiracy beyond a reasonable doubt, it is sufficient to support a conviction." *Id.* Appellants do not dispute that Saccoccia was involved in some sort of money laun-

dering conspiracy. Instead, they contest the link between that conspiracy and themselves.

■ Because both the money laundering counts and the conspiracy count turn on whether Appellants knew that the money with which they dealt was derived from illegal sources, we discuss the sufficiency of the evidence with respect to both the substantive and conspiracy counts together. There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).[15]

### A. *Masino and Messer*

■ The crux of the government's case against Masino and Messer was that they engaged in highly suspicious financial transactions that should have alerted them to the fact that the money with which they dealt was criminally derived, and that their businesses did not engage in any legitimate business transactions. We conclude that the evidence against Masino and Messer, although far from overwhelming, was sufficient to allow a rational trier of fact to find beyond a reasonable doubt that they knew that they were conducting transactions with money derived from illegal sources.

First, the government produced substantial evidence at trial of the amount of cash and checks that were delivered to CIE and IMM, from which the jury could have inferred that Masino and Messer must have known of the illegal nature of the proceeds. Richard Gizzarelli and Joseph de Marco, employees of Saccoccia's east coast enterprise, testified that they sent significant quantities of cash and

---

**15.** With respect to whether the proceeds were in fact derived from drug trafficking, the government put forth evidence sufficient to allow a rational trier of fact to decide beyond a reasonable doubt that the funds were so de-

rived. For example, Joseph de Marco, an employee of Saccoccia, testified that Saccoccia had admitted to him that the funds were derived from drugs.

cashier's checks from New York to CIE and IMM by armored carrier. Louis Palafoutas, a former employee of IMM, testified that IMM regularly received deliveries of canisters from Saccoccia's company, Trend Precious Metals. From March, 1989, until sometime in June, 1989, IMM received shipments one to three times a week, each containing approximately $100,000 to $200,000 in small denomination bills. Palafoutas testified that either he or Masino would count the cash, and only one in every five or six shipments contained gold. CIE would receive deliveries of canisters of cashier's checks as well. The canisters, however, contained more than checks; de Marco testified that he would add alloy, a worthless refining waste, to the canisters to add weight so that it would appear that they contained gold, as stated on their shipping labels.

Cash that had been collected locally was also delivered to CIE and IMM. For example, Palafoutas testified that he once saw Saccoccia and Masino in the IMM office with approximately $300,000 in cash in a duffel bag. Palafoutas saw Saccoccia visit IMM on six to eight other occasions carrying cash in a store bag or duffel bag. Mauricio Mejia, a money courier for Saccoccia, testified that he would also collect money and deliver it in gym bags and cases to CIE. He would then count the money, sometimes with the assistance of Masino and Messer, place it in a safe, and contact Saccoccia. On a couple of occasions, Mejia saw Masino and Messer pick up the cash. Mejia also testified that on one occasion he, Saccoccia, Masino, and Messer transported $1 million from Saccoccia's home to CIE; Masino and Messer transported approximately $400,000 of the cash.

Two witnesses testified that it was uncommon to use large quantities of cash in the gold industry. Jean Mahroukian, an experienced money launderer and gold trader, testified that he would use a company or cashier's check when buying gold legitimately. Palafoutas testified that, aside from certain "Vietnamese customers" who would pay in cash, the customers would generally pay for gold with a company check, cashier's check, or bank wire.[16]

Second, the government introduced evidence that Masino and Messer did not conduct any legitimate transactions through CIE and IMM. Gizzarelli testified that he did not recall ever receiving a receipt or gold from CIE or IMM despite his shipments of cash. Palafoutas similarly testified that IMM never sent any "gold or product" back east. When federal agents searched CIE, they found no invoices, inventory of gold or precious metals, receipts from the sale of gold or precious metals, or other documents indicating that CIE had engaged in the importing or exporting of precious metals.

Palafoutas' testimony with respect to the purchase and sale of gold further buttresses the conclusion that IMM was not engaging in legitimate transactions. Palafoutas testified that beginning with Trend Precious Metals' first shipment of cash to IMM, Masino instructed him to use the cash to purchase gold from a company called 24 Karat. Palafoutas would pur-

---

16. In fact, the nature of the shipments to IMM caused Palafoutas to question the source of the funds. According to Palafoutas, Masino explained to him that the initial cash shipment from Saccoccia was proceeds from Trend Precious Metals that "they didn't want to declare ... as of yet" and so it was IMM's to use in the meantime. However, "[b]ecause the consistency of the shipments, the quantity being shipped, and the fact that there was nothing going back to the East Coast ever in any form as far as gold or product or anything being bought in Los Angeles that needed to be bought in Los Angeles," Palafoutas concluded that Masino's explanation was incorrect. According to Palafoutas, when he confronted Masino with his concerns, Masino said that "he was locked into Steve Saccoccia because of debts that had been incurred by the company." Masino testified, however, that he thought Palafoutas was questioning the profitability of their work for Saccoccia rather than the legality of it and that he told Palafoutas that Saccoccia was running a legitimate business.

chase the gold from this company at a higher than competitive price so that he would not receive an invoice for the gold. He would then sell it to IMM's customers at a lower price. In exchange for the gold, Palafoutas would get checks or cashier's checks, and deposit them in IMM's bank account. Saccoccia would instruct Masino to wire the bank deposits to Saccoccia's east coast bank accounts. By April, 1991, the wire transfers were made primarily to foreign banks located in New York City, the majority of which were Columbian.

Finally, the government introduced evidence suggesting that Masino and Messer were afraid that the nature of their transactions would be discovered. For example, the government presented evidence of recorded conversations between Saccoccia and Masino in which Saccoccia warned Masino that his phones were probably being monitored and that he should communicate over his cellular phone. Palafoutas testified that on one occasion, Masino told him that he had spotted federal agents in the hallway outside of their offices. Palafoutas suggested to Masino that they "clean up the office a bit" with respect to the canisters they were receiving from Trend Precious Metals, and they subsequently scratched off and blackened the labels on the canisters that showed their place of origin—from where they had been shipped. The government also presented evidence of recorded conversations between Masino and Messer in which they discussed what could be inferred to be law enforcement surveillance and the possible monitoring of their phone conversations.

Masino and Messer testified at trial and provided different explanations for much of the government's evidence. For example, with respect to the inferences that could be drawn from Masino and Messer's involvement with large quantities of cash, Messer testified that he often carried large quantities of cash when he traveled on trips to purchase gold, and that he often dealt in cash at his prior place of employment. Masino testified that he sometimes sold gold for a loss in order to maintain business. They emphasize on appeal that they believed Saccoccia was a legitimate businessman, that Saccoccia did in fact conduct legitimate ventures, that they conducted business using their real names, and that they were not paid large salaries. They also note that Saccoccia went to great lengths to conceal the nature of his business from them, and that they behaved suspiciously at times because they feared being robbed due to their line of business.

We find Masino and Messer's arguments unavailing. It was the province of the jury to resolve conflicts between the testimony of Masino and Messer, on the one hand, and witnesses like Gizzarelli and Palafoutas on the other. *Cf. United States v. Golb*, 69 F.3d 1417, 1423–24 (9th Cir. 1995) (noting that the jury did not have to accept the defendant's explanation for the suspicious way in which he received funds). Further, a jury may base its verdict on inferences drawn from circumstantial evidence; it is mere suspicion or speculation that is insufficient to support a conviction. *See United States v. Kurt*, 986 F.2d 309, 312 (9th Cir.1993). The evidence produced in this case allowed the jury to do more than merely speculate: Masino and Messer received immense quantities of cash and cashier's checks from Saccoccia, which they converted into funds that could be wired to primarily foreign banks. There was no evidence of any legitimate transactions to account for these payments, and Masino and Messer feared detection. Viewing the evidence in the light most favorable to the government, we conclude that there was sufficient evidence to allow a rational trier of fact to find beyond a reasonable doubt that Masino and Messer knew that the money with which they dealt was derived from illegal sources, and therefore, that there was sufficient evidence to convict them of violating § 371 and § 1957.

### B. Khachatrian

The evidence presented against Khachatrian, although similar to that against

Masino and Messer, was significantly less probative. Instead of allowing an inference that Khachatrian must have known that he was engaging in transactions with criminally derived proceeds, the evidence merely casts him in a suspicious light. Therefore, we conclude that the evidence is insufficient to convict him of money laundering and conspiracy to launder money.

We acknowledge that the government presented evidence that raises suspicions about Khachatrian. For example, there was testimony that, like Masino and Messer, Khachatrian received shipments of cash from Saccoccia. Palafoutas testified that Masino also gave Khachatrian cash in small denominations with which to buy gold. There was evidence that Khachatrian used the same code words as the other Appellants and was aware of Messer's fears that he was being followed. Perhaps most damning was the evidence that Khachatrian transferred funds by wire on Saccoccia's behalf.

On the other hand, most of the evidence presented at trial had nothing to do with Khachatrian. Further, Khachatrian generally received shipments that contained gold instead of cash. Therefore, the major inference that may be drawn against Masino and Messer—that deliveries of such large quantities of cash indicates criminality—may not be drawn against Khachatrian.

Finally, Masino testified to a business arrangement between Khachatrian and Saccoccia that accounts for Saccoccia's shipments to Khachatrian and Khachatrian's wire transfers for Saccoccia and payments to IMM. Masino testified that Saccoccia had extended Khachatrian a line of credit in the approximate amount of $150,000 for the purpose of buying and selling gold. Saccoccia would send RGE gold and sometimes cash as an advance on this line of credit. In order to remain within the credit line, Khachatrian would pay certain balances on a daily basis. Saccoccia charged Masino and sometimes Messer

with making sure Khachatrian stayed within the credit limit. Masino testified that he would receive directions from Saccoccia as to where he wanted payments sent, and then he would instruct Khachatrian to make wire transfers on Saccoccia's behalf.

In sum, Khachatrian was not dealing with amounts of cash comparable to Masino and Messer, and there is a reasonable, legitimate explanation for the transactions in which Khachatrian participated. We find Khachatrian's use of code words and knowledge of certain security issues, although suspicious, to be insufficient to support an inference that he knew that he was engaging in transactions with criminally derived proceeds. We therefore conclude that there was insufficient evidence to convict Khachatrian.

### IV.

Because the Speedy Trial Act was violated, we reverse the convictions and vacate the sentences of Masino, Messer, and Khachatrian. We remand this case to the district court for a determination pursuant to § 3162(a)(2) whether the indictment against Masino and Messer should be dismissed with or without prejudice. Because there is insufficient evidence to support Khachatrian's conviction, the indictment with respect to him must be dismissed with prejudice.

**REVERSED and REMANDED.**

O'SCANNLAIN, Circuit Judge, concurring in part and dissenting in part:

Because I can find no instance of reversible error in the trial record to suggest that the Speedy Trial Act was violated, I must respectfully dissent from Part II of the majority's opinion. I concur in the sufficiency of the evidence analysis in Part III which moots my Speedy Trial Act analysis as to Khachatrian.

The majority does not point to a single instance of error in any of the five district court orders continuing the trial. Instead,

it simply declares that the "sheer length of the delay" itself is grounds enough for finding a violation of the Speedy Trial Act, as though this excuse for reversal rises like an emergent property from the trial record. Maj. op. at 339. Examining each of these orders in detail, I conclude that district court ruled properly on each occasion. I respectfully decline to join the majority in aggregating five correct rulings into one transcendent incorrect one.

## I

Let us first review the reasonableness of the individual continuances that were premised on Saccoccia's unavailability for trial. In its March 30, 1992 order, the district court granted a continuance, under 18 U.S.C. § 3161(h)(7), on the ground that Saccoccia was a fugitive in Switzerland. The majority itself cites to *United States v. Tobin*, 840 F.2d 867 (11th Cir.1988), a case in which the Eleventh Circuit held that an eight-month delay to apprehend a co-defendant was reasonable to apply to the appellant in that case. *See id.* at 869–70. Likewise, a delay of over three months to apprehend a co-defendant was held reasonable by the Eighth Circuit. *See United States v. Cordova*, 157 F.3d 587, 598–99 (8th Cir.1998). Thus, the five-month delay granted to the government, continuing trial to September 15, 1992, to apprehend and to extradite Saccoccia was not unreasonable. In any event, the sheer complexity of the case and the need for foreign evidence were adequate factors upon which to validate the first continuance.

In its July 31, 1992 order, the district court found that a continuance to February 9, 1993 was necessary because Saccoccia was to be tried first in Rhode Island rather than California. The district court thoroughly investigated the government's decision and the district court's findings are compelling. First, the Rhode Island indictment was filed prior to the California indictment. It would seem strange, therefore, that the California trial should take

precedence over this earlier indictment. Second, the Rhode Island indictment joined Saccoccia with other co-defendants. Thus, the Rhode Island district court would be faced with the same speedy trial issues that the Central District of California faced. In addition, three of the Rhode Island co-defendants were incarcerated pending trial. The government understandably preferred to compel to await trial the co-defendants out on bail rather than the co-defendants who were incarcerated. Thus, because the delay issues were similar in Rhode Island and in California, the government's decision to try the Rhode Island indictment first was eminently justifiable.

In *United States v. Dennis*, 737 F.2d 617, 621 (7th Cir.1984), the Seventh Circuit held that a 144–day delay was reasonable under § 3161(h)(7) to allow for Dennis' co-defendant to be "transported out of district on a preceding writ of habeas corpus ... for prosecution on a different charge" in a different district. *Id.* at 620. The court reasoned that Dennis's co-defendant "was in custody and his whereabouts known at all times; while the government did not know precisely when [the co-defendant] could be produced, there was never any doubt that he would be produced; the delay was necessary to insure a joint trial." *Id.* at 621. Similarly, in this case, once Saccoccia was extradited to Rhode Island, Saccoccia was in custody and his whereabouts were known. Furthermore, the government also knew that he would be produced eventually. Finally, the delay was necessary for Saccoccia to finish his trial in Rhode Island so that he could then be transported to California to face trial with Appellants. *See also United States v. Piasecki*, 969 F.2d 494, 501 (7th Cir.1992) (holding that the time taken for a co-defendant to face trial before another judge was excludable as to that co-defendant and, because the co-defendant "was an unsevered co-defendant whose time for trial had not run, this time, likewise, constituted excludable delay as to Piasecki").

The district court's December 11, 1992 order continuing trial to May 18, 1993 was justified by the delay in Saccoccia's Rhode Island trial. The sudden illness of Saccoccia's counsel caused a mistrial and a continuance of the Rhode Island trial to February 1993. Appellants argue that Saccoccia could have been transported to California to stand trial before returning to Rhode Island for retrial. The Rhode Island district judge, however, specifically requested that Saccoccia remain in his district pending retrial, a request the government "felt obliged to respect." Compliance with the Rhode Island judge's request was completely reasonable. First, the Rhode Island trial had started. Thus, the judge and government were fully prepared to go forward with the trial. Second, Appellants did not oppose the government's motion for this continuance with any vigor. In fact, defense counsel "indicated that, while [they] continue[d] to oppose any continuance based upon the arguments [they] originally put forth in March, 1992, ... [they] recognize[d] that the reasons stated in the court's March 30, 1992 order still appl[ied] in this case as a basis to continue the trial." In light of this evidence, the additional three-month delay occasioned by the court's order was perfectly understandable.

The final continuance granted by the district court in its April 5, 1993 order, which moved the trial date to September 1993, was justified by Saccoccia's need to retain counsel in Los Angeles and for the new counsel to prepare for trial. This circuit has held that four months of excludable delay while a co-defendant prepares for trial can be reasonably applied to another defendant. See *United States v. Butz,* 982 F.2d 1378, 1381–82 (9th Cir. 1993). Thus, the four-month delay to allow Saccoccia to prepare for trial was clearly reasonable especially given the complexity of the case and volume of the evidence.

Not one of these five orders involved reversible error, and the majority opinion makes no attempt to argue the contrary. How the majority can then prestidigitate a reversal is baffling. Certainly, the seventeen-month delay in this case is significant, but as the majority concedes, this is not the longest delay the courts have found reasonable under § 3161(h)(7) of the Speedy Trial Act. In *United States v. Salerno,* 108 F.3d 730 (7th Cir.1997), for example, the Seventh Circuit found a seventeen-month delay between Salerno's first trial, in which the jury could not reach a verdict, and his second trial to be reasonable. In *Salerno,* the delay was caused by a flurry of post-conviction motions filed by Salerno's co-defendants. Salerno, who had not been convicted in the first trial, was not a party to any of those motions. In the end, only Salerno was tried on the additional counts not decided in the first trial. Like Appellants, Salerno's long delay was for nought because he was ultimately not tried with the co-defendants for whom he had waited so long. The Seventh Circuit decided, nevertheless, that the delay excludable as to Salerno's co-defendants was attributable to Salerno because the co-defendants were subject to retrial on the remaining counts along with Salerno. See *id.* at 736. Likewise, in this case, the almost seventeen-month delay is long but, because it was excludable to Saccoccia, it was also excludable to Masino and Messer.[1]

II

Let us turn next to the majority's prejudice analysis. Regarding this element of the Speedy Trial Act, the Fifth Circuit has recently provided illumination: "With respect to the prejudice analysis, relevant considerations include whether the delay impaired the appellant's ability to defend himself or resulted in excessive pretrial incarceration." *United States v. Franklin,* 148 F.3d 451, 457 (5th Cir.1998).

---

1. In addition, only the final twelve months of delay were attributable solely to Saccoccia's

delays. The first continuances were justified by other factors.

Appellants proffer three arguments to support their claims of prejudice: (1) the delay gave the government substantially more evidence to prove its case than was available at the original trial date; (2) the delay removed any pressure from the United States attorney in Rhode Island to plea bargain with the Los Angeles defendants; and the only argument revealed by the majority, (3) that an important witness had died before trial.

The first two arguments are devoid of merit, as the majority's failure even to mention them suggests. Their first concern—that the government's additional time to prepare made its case stronger against Appellants—is simply not a valid showing of prejudice. *See Salerno,* 108 F.3d at 738 (stating that " 'prejudice is not caused by allowing the Government properly to strengthen its case, but rather by delays intended to hamper defendant's ability to present his defense' " (quoting *United States v. Tedesco,* 726 F.2d 1216, 1221 (7th Cir.1984))). The second claim—regarding plea bargaining ability—is impossible to comprehend because of Appellants' inadequate development of the argument. Appellants provide no explanation of why passage of time would affect their plea bargaining ability. Nor do Appellants indicate whether they ever approached the government to initiate plea bargaining or if they would have been willing to accept a plea had the opportunity presented itself.

Like the majority, I conclude that the third allegation of prejudice is the only one worth exploring. Certainly the loss of a potential witness goes to Appellants' ability to defend themselves at trial. Mr. Aghabegian, however, was an outsider who would not have known the details of IMM, Clinton, and RGE. In addition, it is somewhat suspicious that *the only* witness Appellants would have called at trial died. Messer and Masino provided the defense's *only* testimony at trial.

Furthermore, generalized complaints about the overall length of the delay are similarly weak. We must remember that Appellants were not subjected to lengthy pretrial incarceration. *See Salerno,* 108 F.3d at 738 ("[D]efendant cannot convincingly claim that he was prejudiced by the unresolved criminal charges looming over his head. He was neither incarcerated during the seventeen-month period, nor did he seek to modify his bond conditions during that time." (internal citation and quotation omitted)); *United States v. Mobile Materials, Inc.* 871 F.2d 902, 917 (10th Cir.1989) ("[W]e cannot ignore that prior to trial ... Mr. Philpot was free on bond."). These Appellants suffered far less inconvenience than defendants incarcerated while awaiting trial.

### III

Finally, the majority's newly announced rule regarding severance is an unjustifiable pronouncement on this issue. *See* maj. op. at 340. With very good reason, courts frequently consider a defendant's efforts to sever trial a vital factor in evaluating prejudice. *See Franklin,* 148 F.3d at 457 ("A defendant's failure to move for severance, or otherwise to pursue a speedy trial in the district court, can undermine prejudice allegations made on appeal."); *Mobile Materials,* 871 F.2d at 917 ("Nor can we overlook the fact that throughout the protracted history of this prosecution Mr. Philpot has never filed a motion for severance."). Indeed some circuits have held that a defendant *must* make a motion to sever in order to rely on the reasonableness requirement of subsection (h)(7). *See, e.g., United States v. Vasquez,* 918 F.2d 329, 337 (2d Cir.1990). In this case, Appellants did not move to sever their case from Saccoccia's and now argue that a motion to sever would have been pointless. Their decision not to do so, however, could easily be interpreted as a tactical decision—an attempt to take advantage of the Speedy Trial Act. As the district court noted, "because the defendants were represented by able and experienced counsel, the Court can only assume that counsels' decision not to move for severance was a

**348**

strategic one." I cannot agree with the majority's assertion that a defendant's failure to file a motion for severance is not a critical issue in evaluating his appeal based on the Speedy Trial Act. If the defendant himself is in no hurry to proceed to trial, why should we entertain his assertions later that he was prejudiced by the wait? I respectfully maintain that we should not.

### IV

While the overall delay in this case may have been lengthy, each individual postponement was amply supported by the circumstances at the time. In each case, the district court filed well-considered orders establishing the necessity and reasonableness of the continuances. The government's and district court's emphasis on bringing a single trial against all four defendants was entirely rational. In light of the resources involved in Appellants' three-month trial, an unnecessary repeat performance would indeed have been a waste of judicial and prosecutorial resources. Yet, pointing to no mistakes by the district court, the majority now nevertheless orders just that.

I respectfully dissent.