**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 98-20782

_____

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

DUNCAN BURTON; LELAND EARL WILLIAMS, also known as Robert Randle, also known
as Tee Lee, also known as Timothy Houston,
Defendants-Appellants.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
(H-95-CR-303)

_____

July 14, 2000

Before REYNALDO G. GARZA, JOLLY, and HIGGINBOTHAM, Circuit Judges.

PER CURIAM[1]:

**BACKGROUND**

A.      Procedural History

On December 4, 1995, the government filed a 25-count indictment charging Burton,

Williams, and ten others with conspiracy to possess with intent to distribute crack cocaine in

violation of 21 U.S.C. § 846 (count one); and aiding and abetting the underlying substantive

---

[1] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

offense in violation of 21 U.S.C. §§ 841(a)(1), and (b)(1)(B) and 18 U.S.C. § 2 (counts 2-25). Burton was named in counts 1, 13-17, 19-20 and 23, and Williams was named in counts 1 and 10-14.[2] After a jury trial that began on March 24, 1998, the jury convicted Burton of counts 1, 14-17, and 19-20 and acquitted him of count 13.[3] The jury convicted Williams of counts 1, and 10-13 and acquitted him of count 14.

On August 13, 1998, the district court sentenced Burton to concurrent terms of 216 months imprisonment on all counts, to be followed by concurrent terms of five-years supervised release on counts 1, 17, 19-20, and four years on counts 14-16. The court imposed a $5,000 fine and $350 special assessment. On September 1, 1998, the court sentenced Williams to concurrent terms of life imprisonment as to counts 1 and 12 and to concurrent terms of 40 years imprisonment as to counts 10-11 and 13; followed by concurrent terms of five years supervised release on counts 1 and 12 and four years on counts 10-11 and 13. The court imposed a $2,000 fine and $250 special assessment.

B.    Facts

    1. Government Evidence

        a.    Introduction

In April-May of 1995, the Drug Enforcement Administration ("DEA") began an

---

[2] Williams, Burton, Bernard Anthony Dale, Dyas Kirkpatrick Evans, Kerry Jackson, Otis Williams, Sammy Cole, Ricky L. Kay, George C. Morgan, Willie Evans, and Virgilio Florez Mezu were charged in count one charging conspiracy. Various individuals were charged in the remaining counts charging aiding and abetting possession with intent to distribute powder and crack cocaine in counts 2-25. The co-defendants all pled guilty either before or during the trial. Williams had aliases of "Tee Lee," "Robert Randle" and "Timothy Houston."

[3] Before trial, the district court dismissed count 23 as to Burton upon request of the government.

investigation of an alleged crack cocaine distribution network headed by Bernard Dale in Galveston County. The DEA gathered information from three primary sources: informants, cooperating defendants, and police officers. According to the government, Dale purchased large amounts of powder cocaine, manufactured it into crack, and distributed crack from his automotive repair business in Galveston and various residences in Houston and Galveston to smaller distributors, including Williams, Leon McGrew, Dyas Evans, Willie Evans, Kerry Jackson, George Morgan, Sammy Cole, and Revester Murphy. Tyrone Cooper served as Dale's supplier between 1992 and 1993, but after Cooper was arrested on drug charges, Ricky Kay and Virgilio Mezu, replaced Cooper as suppliers.

In 1994 and 1995, Dale distributed cocaine to Williams and through Williams expanded his cocaine business to Knoxville, Tennessee. According to the government, between November, 1994 and February 1995, Burton transported to Knoxville from Galveston several multi-kilogram loads of cocaine for Williams, Dale and McGrew, Dale's right-hand man. Several co-defendants and cooperating witnesses testified at trial.[4]

   b.  Dale's Organization

Between the Summer of 1992 and May of 1993, Tyrone Cooper often fronted kilograms of cocaine to Dale and Dale paid Cooper from his proceeds. When Cooper went to prison in May 1993, his girlfriend Regina Booker and Ricky Kay continued Cooper's business. Thereafter,

---

[4] Co-defendants Dale, Willie Evans, Dyas Evans, Sammy Cole and Kerry Jackson testified at trial. Cole and Jackson pled guilty prior to trial and the other defendants pled guilty during the trial. Leon McGrew, Steven Timms, Tracy Russell, Tyrone Cooper, Kevin Cooper, Regina Booker, Chuck Olson Jones, and David Merchant testified as cooperating witnesses at trial. All of the witnesses testified concerning their prior felony convictions and any special cooperation agreements involving leniency.

Ricky Kay became Dale's supplier.

Between 1992 and early 1995, Kerry Jackson distributed crack cocaine for Dale to individuals in Galveston County and Hammond, Louisiana, and brought the money back to Dale. Jackson was arrested on three separate occasions while working for Dale; and money, cocaine and a .38 caliber handgun were confiscated.

Between 1992 and 1994, McGrew's purchases of cocaine began to grow until McGrew stopped buying from Dyas Evans at Dale's auto shop and started to buy directly from Dale. By April of 1994, McGrew and Dale regularly went to Ricky Kay's house to buy cocaine and cooked it together. Between May and September 1994, they used Virgilio Mezu as an additional powder cocaine source. McGrew recalled on one occasion that Dale purchased 20 kilograms of cocaine from Mezu for $340,000.

In the Summer/Fall of 1993, Willie Evans transported kilograms of crack cocaine to George Morgan, one of Dale's distributors in Dallas, receiving $500 per trip. Willie ultimately moved to Irving, Texas to assist Morgan in distributing cocaine in Dallas. In December of 1993, Willie and Morgan had a "falling out," and Willie approached McGrew about supplying him cocaine to sell in Dallas, which McGrew and Dyas Evans eventually did. Morgan was arrested following a cocaine seizure at his Irving residence. Irving police seized two and a half kilograms of crack cocaine, seven guns and a rifle, five pounds of marijuana, a safe containing $18,000 and "drug notes."

c.     Williams' Participation in Dale's Organization

In August/October of 1994, Dale began transporting cocaine to Leland Williams, Darrell Parks ("Floopie") and Willie Evans in the Dallas area. Williams was responsible for about 15% of

the business. When McGrew and Dale traveled to the Dallas area to transport the cocaine and retrieve the money that was owed Dale, they would conceal the cocaine in the bed liner of a rental truck, or transport it in their own vehicle. Often, Duncan Burton would drive the load for them or with them, and they would stay at Williams' ranch in DeSoto, Texas.

A few weeks after first meeting McGrew at Dale's shop, Williams delivered $115,000 to Dale's apartment for 5-6 kilograms of cocaine supplied to him to sell in Knoxville, Tennessee, for $27,000 per kilogram. Dale reported that he made a $40,000 profit from Williams's Tennessee trip. McGrew testified that after this trip, he accompanied Dale and Dyas Evans to Williams's DeSoto ranch, which had a main and guest house with a swimming pool. The next weekend, Dale brought powder cocaine to Williams at the ranch and later told McGrew that he and Williams cooked to cocaine and that Williams gave it to others, including Darrell Parks.

Dyas Evans testified that Dale introduced Williams as a potential cocaine purchaser in August or September of 1994. Dale wanted Evens to get to know Williams better, so Evans went with Dale to Williams's ranch, where he saw one and a half kilograms of cocaine, which Williams told Evans he was selling to two other men at the ranch.

Willie testified to meeting Williams in July of 1994 at Dale's shop. In August of 1994, Willie accompanied Dale to Williams's ranch, bringing with them detergent boxes containing two kilograms of powder cocaine and nine ounces of crack, some of which was put in paper bags to be placed in the van. One was Willie's and the other was "Floopie"'s (Darrell Parks). Willie delivered powder cocaine to Williams's ranch on two subsequent occasions.

Steven Timms (Williams's cousin) testified that he went to Galveston with Williams to meet Dale in August of 1994. As a result of this meeting, Timms and Williams transported five

kilograms of cocaine to Knoxville and delivered it to a man named "Murphy." Timms and Williams stayed at the Red Roof Inn in Knoxville and then returned the money to Dale in Galveston. Records reflect that "Leland E. Williams" rented two rooms at the Red Roof Inn in Knoxville on August 10, 1994. Timms further testified that they transported three more kilograms of cocaine to Knoxville for Dale a few weeks later, and Timms recalled meeting Duncan Burton at Murphy's house during the trip.

McGrew testified to seeing Williams at least 25 times between August and November of 1994 in the Galveston and Dallas areas to discuss their cocaine business. He also claimed that Dale, who would later complain of having to post bond in the amount of $100,000 for Williams when he was arrested in Corsicana, delivered five kilograms of cocaine on October 5, 1994 to Williams and Timms at Dale's house.

Timms testified that in early October of 1994, he and Williams picked up five kilograms of cocaine from Dale's house. They wrapped the bundles in fabric softener, put them in a bag, and headed back to Dallas. As they drove through Corsicana they were stopped, arrested, and the cocaine was seized. When officials later learned Timms's true identity, he notified Williams that officials had discovered Williams's real identity as well. Telephone records reflect that 60 collect calls were placed from the Navarro County Jail to Williams's residence between October 6, 1994 and November 8, 1994.

Department of Public Safety ("DPS") sergeant Michael Turner testified that he arrested Williams and Timms in Corsicana on October 5, 1994, after stopping Williams for speeding. Williams and Timms both provided false names, gave conflicting stories, and appeared nervous. Sergeant Turner searched the car pursuant to Williams's verbal consent, finding five large bundles

of cocaine, weighing five kilograms and wrapped in fabric softener inside an overnight bag in the trunk. He also found marijuana beneath the driver's floorboard and documents (e.g. a piece of paper exhibiting a phone number that was traced to Dale's address at 626 Buttonwood Drive and another regarding a car rental agreement).

Williams was booked in Navarro County Jail under the name "Robert Randle" and released two days after his arrest on October 6, 1994 on a $100,000 bond. He was placed back in jail on November 9, 1994 on a bond revocation. Williams gave the following written statement at the jail: "The bag that Trooper Turner found in the trunk of the car that I was driving was my bag with my clothes in the bag." He did not admit to possessing the cocaine, however, or signing the statement as "Robert Randle."

Dyas Evans testified that after Williams bonded out of jail, he went back to Galveston with Angie Ballard and asked Dale for more cocaine because he wanted to "work off" the debt owed for the seized cocaine. Dale gave Williams three more kilograms of cocaine. Otis Williams told Evans that Williams was going to put the cocaine in a spare tire and that Ballard was going to carry it to Tennessee. Evans later learned from Dale that this cocaine was also seized.

Louisiana State Trooper Travis Savoy testified that on October 15, 1994, he arrested Angela Ballard, Tracy Russell and Johnny Dobbins (later identified as Edward Woolrich) in Lake Charles, Louisiana, following a traffic violation. After Russell refused consent to search the vehicle, narcotics-sniffing canines inspected the car, alerting police to 3.3 kilograms of cocaine concealed inside the spare tire from the trunk, a marijuana cigarette from Russell's purse, and various documents, including a receipt from Tire Lubing Express in the name of "Robert Randle" at 828 Parkerville, DeSoto.

Tracy Russell testified prior to her arrest that she had seen 1-4 kilograms of cocaine at Williams's ranch 8-10 times, and Williams and others cooking the cocaine. On October 14, 1994, Williams arranged for Russell, Ballard and Woolrich to travel to Houston and onto Knoxville the next day. Williams, who had given Ballard money, and Dale met the trio in Houston. Russell recalled overhearing Williams tell Woolrich not to drink or smoke marijuana on their trip. Before departing for Knoxville, Williams gave Ballard more money, and he and Dale provided directions. Ballard, Russell and Woolrich were subsequently stopped and arrested in Lake Charles. Williams offered to pay for a lawyer for Russell, but she declined his offer.

After the seizure, McGrew testified that he told Dale he should not continue supplying cocaine to Williams. Nonetheless, Dale arranged for Williams to make another trip in early November of 1994. Williams put 3-4 kilograms of cocaine inside his van's tires and loaded the van on a trailer. Williams arranged for his driver, Burton, to haul the van in a rental truck to Tennessee. Records reflect that Burton checked into the Pelican Inn in La Marque on October 30, 1994, checked out on November 1, 1994, and rented a Ryder Rental moving van on October 31, 1994.

While in Tennessee, Williams was apprehended by his bondsman. On November 11, 1994, Dale and McGrew traveled to Williams's hotel in Knoxville to recover Dale's van and the cocaine. They found nothing, and later met with Revester Murphy, the person Williams identified as the purchaser. McGrew and Dale told Murphy they would be taking over the Knoxville dealings, asking how much Murphy could distribute. They had the same conversation with Sammy Cole, who recalled meeting Williams and Burton for the first time when he went to Murphy's house in Knoxville in 1994 to purchase cocaine.

### d. Burton's Participation in Dale's Organization

After Williams's apprehension, McGrew testified that he looked for someone else to transport the cocaine to Knoxville. Dale stated that Burton was from Knoxville and had transported cocaine to Tennessee for Williams. For one shipment of cocaine to Knoxville, Dale did not want to use Otis Williams as the driver because Williams did not have a driver's license and Henry did not want to drive that far. Dale testified that he had found another driver, Duncan Burton. McGrew and Dale preferred to use Burton because he had no criminal record and was less likely to be stopped. Dyas Evans testified that Dale stated that Burton was going to drive the cocaine to Tennessee for Williams.

In early December of 1994, government evidence shows that McGrew and Dale employed Burton to transport 4-5 kilograms of cocaine in a moving van from the Galveston area to Knoxville. Dale paid Burton $3,000 plus $500 expenses for making the trip. McGrew went with Burton to rent a moving van and provided the cash for the rental, which was loaded with old furniture and clothes to conceal the cocaine. Burton notified McGrew when he arrived in Knoxville. Once the cocaine was distributed, McGrew brought the money back to Galveston. Records reflect that in early December of 1994, McGrew rented cars in Alcoa, purchased a flight with American Airlines, and charged rooms at the Holiday Inn and Quality Inn in Knoxville. On December 1, 1994, Burton rented a moving van until December 6, 1994 for $928. He paid with cash and dropped the vehicle off at the dealer in Knoxville. He stayed at a hotel in Texas City on December 8, 1994.

In mid-December of 1994, McGrew hired Burton to transport another load of cocaine from the Galveston area to Knoxville. Records reflect that on December 13, 1994, McGrew flew

to Nashville, rented a car in Alcoa, and arrived at the Holiday Inn in Knoxville on December 18. A Western Union receipt reflects "Pete Morgan" (McGrew) wired $1,000 to Burton at Murphy's address in Knoxville on December 19, 1994. Burton rented a Ryder Rental truck on December 19, 1994, and stayed at the Holiday Inn in La Marque, Texas, on December 21, 1994.

In January of 1994, McGrew employed Burton to transport 6-8 kilograms of cocaine to Tennessee. Like before, Burton rented a truck and McGrew concealed the cocaine in a box of Tide soap. McGrew met Burton in Knoxville and delivered the cocaine to Cole. Cole paid him $220,000 and Burton transported the money back to Galveston. Records reflect that Burton stayed at a hotel near Hobby Airport in Houston on January 12, 1995 and January 16, 1995, and McGrew purchased a round-trip flight from Houston to Knoxville and back on January 13, 1995.

In early February of 1995, McGrew hired Burton to transport 6 kilograms of cocaine to Knoxville. McGrew picked up Burton from the airport. Burton rented a U-Haul truck and they purchased some old furniture and clothes and placed them in the back of the truck. They placed two Tide boxes containing 6 kilograms of cocaine in the truck. They placed two Tide boxes containing 6 kilograms of cocaine in the truck. McGrew met Burton in Knoxville and delivered the cocaine to Cole. Cole paid McGrew all but $5000 that was due. Burton transported $150,000-$170,000 back to the Galveston area. Records show that McGrew traveled to Knoxville on February 1, 1995, rented a car, and stayed at the Holiday Inn in Knoxville.

McGrew flew to Knoxville again on February 21, 1995. He contacted Burton at his home in Charlotte, North Carolina, and asked Burton to transport another cocaine load from Galveston to Knoxville. He wired money to Burton. Burton subsequently flew from Knoxville to Houston. Dale assisted Burton in renting and preparing the truck. When Burton did not page McGrew in

Knoxville during his travel, McGrew called Dale and asked if Burton had left with the cocaine. Dale confirmed that he had. Later that evening, Burton notified McGrew from Houston that he had been apprehended and that he had told the police everything. McGrew answered that he did not know what Burton had gotten into but that he did not appreciate Burton bringing him into it and hung up. Burton called McGrew again from a Wal-Mart in Knoxville, warning that McGrew was going to be arrested. McGrew asked to meet with Burton in Knoxville but Burton refused. McGrew later told Dale he believed Burton had stolen the cocaine.

On February 21, 1995, Burton called the DEA office in Charlotte and requested an interview, during which Burton provided information about a drug organization based in Houston that supplied cocaine in the Knoxville area. He named T-Lee (Williams), Anthony Morgan, and Pete Morgan, as some of the individuals in the organization. Burton explained that Williams first approached him about making trips. His role was to transport cocaine from Houston to Knoxville and then take the money back to Houston. Burton had transported cocaine from Houston to Knoxville 6-8 times and "wanted to talk to [DEA] about getting out from under this activity."

On February 22, 1995, agents went to Burton's residence in Charlotte and paged Pete and Anthony Morgan (McGrew and Dale). McGrew called back and said he would wire Burton $200 to fly to Houston to pick up a load. Charlotte agents coordinated this information with agents in Knoxville and Houston. Burton drove to Knoxville and caught a plane to Houston. That same day, surveillance agents observed Burton arrive at Houston Hobby Airport to meet with Dale. That evening, Burton contacted DEA Agent William Owen, reporting that he had checked into the Holiday Inn. The plan was he would go with Dale the next morning to rent a truck.

Later that evening, Burton called Agent Owen a number of times expressing concern

about his family's safety if he cooperated with the DEA. As the night progressed, Burton tried to change the operational plan for the next morning. It became obvious to Agent Owen that Burton would not cooperate and follow agents' instructions. Consequently, Owen directed Burton to discontinue any further contact with Anthony Morgan, and advised that the DEA would not participate in the cocaine transaction the next morning. Nonetheless, around 6:00 a.m. the next morning, Burton notified Agent Owen that Morgan was coming to pick him up to rent the truck. Agent Owen ordered Burton to leave his room immediately and get to safety. Agent Owen repeated that under no circumstances was Burton to follow through with the cocaine transaction.

Around 10:30 a.m. that same day, Burton notified Agent Owen that he was in possession of a rental truck which had been loaded with furniture by Anthony Morgan. In the cargo area of the truck was a detergent box containing 5 kilograms of cocaine. Agent Owen instructed Burton to remain where he was until agents could arrive. He then arranged for DEA agents and local law enforcement to locate Burton. Pasadena Police Officer Larry Candelari located Burton and obtained consent to search the truck. Burton produced a detergent box containing over 5 kilograms of crack cocaine. Dyas Evans testified that Burton had told him that he was enthusiastic about his drug trafficking and that he frequently wore t-shirts with religious messages and placed a Bible on the dashboard on his vehicle to avoid looking suspicious.

On March 8, 1995, McGrew attempted to transport 4 kilograms of cocaine to Knoxville by himself. He was stopped by law enforcement in Louisiana for speeding. Four kilograms of crack cocaine were seized from his truck. Receipts were recovered showing McGrew (aka Pete Morgan) wired money from Knoxville to Dale and Veronica and that McGrew stayed at Ramada Inn in Knoxville from February 21- 24, 1995.

e.    Williams's Jail Escape and Attempt to Leave the United States

On August 5, 1995, Williams escaped from the Navarro County Jail while waxing the floors in the main lobby area of the jail. A woman came to the front door announcing she was there to drop off some "whites" (i.e. underwear). Deputy Gasaway pushed a button to let her in the lobby area. She delivered the laundry and produced her driver's license. On her way out, Williams exited behind her. Deputy Jim Carroll searched for Williams with no success. On September 22, 1995, Williams applied for a U.S. passport using fraudulent documents, requesting that the passport be expedited for travel to Cartagena, Colombia. He was arrested when he returned to pick up the passport.

The government provides a detailed summary of telephone records relating to individuals involved in the investigation.

2.    Defense Evidence

Burton testified that he first met his co-defendants in October of 1994. Murphy introduced Williams as a "potential" investor in a retail computer store. Burton and Williams met a few weeks later to discuss Burton's business plan. Williams offered to pay Burton's expenses to meet his business partner "Anthony Morgan" in Houston if Burton would agree to drive Williams's van back to Knoxville. Burton and Williams flew to Houston and Williams introduced Burton to Dale ("Anthony Morgan"). Following the meeting, at the end of October of 1994, Burton rented a Ryder truck and hauled Williams's van on a car carrier from the Pelican Inn in La Marque to Murphy's house in Knoxville. He helped unload the van. This was the only dealing he had with Williams.

About a month later, Burton testified that he flew to Houston and checked into the Pelican

Inn where he met Dale and McGrew (aka Pete Morgan) to discuss his business plan again. During this trip, Dale and McGrew told him William had been arrested on a bond revocation in Knoxville and in anticipation of his release they planned to set up a residence in Knoxville. At Dale's request, Burton drove a Ryder rental truck loaded with Dale's furniture from La Marque to Knoxville. Burton could not recall if he stayed in Knoxville. He traveled back and forth between Knoxville and Charlotte where his wife lived.

According to Burton, at McGrew's request, in mid-December, Burton drove a rental truck from Charlotte to La Marque to bring back some damaged furniture. Then, in January of 1995, he transported some furniture and clothing to Knoxville for a lady whose house had burnt down. He brought the furniture to Murphy's house in Knoxville. Although he sensed something was wrong when he saw a large sum of money at Murphy's house in Knoxville, he still transported some of the money back to Houston. Burton flew back to Charlotte with the hope of never seeing Dale and McGrew again. When McGrew contacted Burton about making another trip, Burton met with DEA agents in Charlotte and told them that he suspected illegal activity because of the large sum of cash he saw.

Although McGrew and Dale paid him $1,000-$2,000 for making the trips, he claimed he drove the trucks as a favor and did not need the money. On cross examination, Burton denied making several statements reflected in the DEA's reports. Contrary to the reports, he testified he never told agents he was transporting drugs and money.

On appeal, Burton argues that, despite his cooperation with the DEA, the government used this incident as the basis for charging Burton with aiding and abetting, in Count 23 of the indictment. However, he asserts, the government dismissed Count 23 before trial and offered no

evidence that Burton was involved in any drug transactions after this occasion. Furthermore, Burton challenges the sufficiency of the government's evidence on all counts, contending that Burton lacked knowledge that he was transporting narcotics.

Williams attacks the credibility of various witnesses and alleged co-conspirators, including Tyrone Cooper, Kevin Cooper, Olson Jones, Regina Booker, and Kerry Jackson. Williams observes that several government witnesses did not identify Williams and did not testify regarding his direct involvement in the alleged conspiracy. Williams also relies on the testimony of Duncan Burton, who stated that he had no knowledge of Williams's involvement in the alleged conspiracy. He never saw Williams with drugs, and had no direct knowledge that he was transporting drugs. Burton further testified that Williams was interested in investing in a computer business that he had planned to open.

**ANALYSIS**

I      Sufficiency of the Evidence

In considering the sufficiency of the evidence to support Burton and Williams's convictions for conspiracy and aiding and abetting possession with intent to distribute cocaine, the reviewing court must view the evidence presented and all inferences that may be drawn therefrom in a light most favorable to the jury's verdict, and then decide whether any rational trier of fact could have found each element of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed. 2d 560 (1979). A conviction may rest entirely upon the uncorroborated testimony of an accomplice who has entered into a leniency agreement with the government, as long as the testimony is not incredible as a matter of law. *See United States v. Posada-Rios*, 158 F.3d 831, 861 (5th Cir. 1998). Review is limited to a "manifest

miscarriage of justice" when a defendant fails to renew his motion for judgment of acquittal at the close of all the evidence, after defense has been presented. *See United States v. Johnson*, 87 F.3d 133, 136 (5th Cir. 1996). A manifest miscarriage of justice is present if the record is devoid of evidence pointing to guilt. *Id.*

To prove conspiracy to possess with intent to distribute drugs under 21 U.S.C. § 846, the government must prove (1) an agreement between two or more persons to violate the narcotics laws, (2) the defendant knew of the agreement, and (3) that he voluntarily participated in the agreement. *See United States v. Broussard*, 80 F.3d 1025, 1031 (5th Cir. 1996). A conspiracy agreement may be tacit, and can be inferred from circumstantial evidence. *See United States v. Thomas*, 12 F.3d 1350, 1356 (5th Cir. 1994). While mere presence at the crime scene, or association with guilty conspirators is not alone sufficient proof to support a conspiracy conviction, it may provide sufficient evidence of guilt when combined with other evidence. *See United States v. Bermea*, 30 F.3d 1539, 1552 (5th Cir. 1994).

To prove possession with intent to distribute narcotics, the government must prove beyond a reasonable doubt the defendant knowingly possessed a controlled substance with intent to distribute it. *See United States v. Crooks*, 83 F.3d 103, 106 (5th Cir. 1996). Possession may be actual or constructive. "Actual possession is defined as knowingly having direct physical control over a thing at a given time," *United States v. Ivy*, 973 F.2d 1184 (5th Cir. 1992), while constructive possession includes ownership, dominion or control over the contraband, or over the place in which it is contained. *United States v. Shabazz*, 993 F.2d 431, 441 (5th Cir. 1993). Knowledge and intent can be established by circumstantial evidence. *See United States v. Ojebode*, 957 F.2d 1218, 1226 (5th Cir. 1992). Possession of an amount larger than is necessary

for personal consumption supports a finding that the defendant intended to distribute the drug.

*See United States v. Inocencio*, 40 F.3d 716 at 725 (5th Cir. 1994).

To prove aiding and abetting under 18 U.S.C. § 2(a), the government must prove the defendant associated and participated with the criminal venture, and sought by his action to make the venture succeed. *See United States v. Jaramillo*, 42 F.3d 920, 923 (5th Cir. 1995). "The evidence supporting a conspiracy typically supports an aiding and abetting conviction." *United States v. Casilla*, 20 F.3d 600, 603 (5th Cir. 1994).

A.     Burton

The jury convicted Burton of conspiracy to possess with intent to distribute cocaine (count 1) and aiding and abetting the underlying substantive offense (counts 14, 15, 16, 17, 19 and 20). The jury acquitted Burton on count 13. As to all of the convictions, under a manifest miscarriage of justice standard of review, while viewing the government's evidence and all inferences that may be drawn therefrom in a light most favorable to the jury's verdict, we find that a rational trier of fact could have found each element of the crimes beyond a reasonable doubt. Thus, we decline to dismiss any of Burton's convictions.

However, as we will discuss in more detail below, we must vacate Burton's convictions. Since the district court denied Burton his right of self-representation, this Court will vacate his convictions and remand for him to be retried on all counts, excluding count 13, which we shall let stand.

A.     Williams

The evidence sufficiently established Williams's guilt of conspiracy and aiding and abetting possession with intent to distribute cocaine. The jury convicted Williams of conspiracy (Count 1)

and three counts of aiding and abetting possession with intent to distribute cocaine: in or about September or October 1994 (Counts 10-11); on or about October 4, 1994 (Count 12); and on or about October 30, 1994 through November 4, 1994 (Count 13).  As to each count for aiding and abetting possession, viewing the government's evidence and all inferences that may be drawn therefrom in a light most favorable to the jury's verdict, a rational trier of fact could have found each element of the crime beyond a reasonable doubt.  The evidence shows that Williams either transported, or employed someone else to transport several multi-kilogram loads from the Galveston or Dallas areas to Knoxville during the dates specified in the indictment.

The evidence also supports the jury's verdict regarding the conspiracy charge in Count 1 of the indictment.  Although Williams contends that the government was required to prove Williams had actual or constructive possession of the drugs, the government merely had to prove Williams's association and participation with the venture were calculated to bring about that venture's success.  *See United States v. Salazar*, 948 F.2d 1285, 1292 (5th Cir. 1992).  Nonetheless, viewed in the light most favorable to the government, the evidence establishes Williams's actual and constructive possession of the cocaine in each instance.  *See Shabazz*, 993 F.2d at 441 (constructive possession includes ownership, dominion or control over the contraband).  Williams either personally transported the cocaine or dictated how it would be transported, sold it to Murphy and Cole in Knoxville, and either directly or through someone else delivered the cocaine proceeds to Dale.  Thus, Williams knowingly participated and effectuated the goals of the conspiracy to distribute cocaine for profit.

II      Jencks Act

The Jencks Act requires the prosecution to disclose a prior statement of a witness in its

possession relating to the subject matter of that witness's testimony. Williams contends that the district court erred in failing to order the government to disclose DEA reports made after debriefings of Tyrone and Kevin Cooper. The district court ordered government investigators to produce the DEA reports generated as a direct result of their investigation of Tyrone and Kevin Cooper. Upon obtaining and inspecting this information, the court ruled that it was irrelevant and did not order disclosure to the defense counsel.

Williams does not cite to any portion of the record indicating that he made an objection under the Jencks Act. Review is limited to plain error where no objection is made. A district court's determination whether evidence is producible under the Jencks Act (18 U.S.C. § 3500) is reviewed for clear error. *See United States v. Martinez*, 87 F.3d 731, 734 (5th Cir. 1996). The burden is on the defense "to initiate the proper inquiry into the right to claim production of a statement under the Jencks Act." *United States v. Edwards*, 720 F.2d 529, 531 (5th Cir. 1983); *see also United States v. Pierce*, 893 F.2d 669 (5th Cir. 1990) (where defendant made no showing that a document qualified as Jencks Act material, the court was not obligated to even inspect the document in camera).

The agents' reports made after the debriefings do not constitute Jencks Act materials. A statement under the Act must either be the written statement of the witness, or a recording that is substantially verbatim recital of an oral statement made by the witness and contemporaneously recorded. *See Martinez*, 87 F.3d at 734-37 (district court's order to produce agents' report reversed since it did not qualify as a Jencks Act statement). The government and the court apparently agreed that the statements at issue were neither written by the witnesses nor were recordings of substantially verbatim recitals of an oral statement made by the witness and

contemporaneously recorded.  Thus, the district court did not violate the Jencks Act or commit reversible error in failing to order the disclosure of the material.

III      Burton's Right of Self-representation.

The government concedes that there is no evidence to refute Burton's contention that the Court erroneously rejected his unequivocal request for self-representation, without any inquiry, in violation of the Sixth Amendment.  The record shows as follows.  Burton was appointed counsel, Ms. Elizabeth Mends, on December 20, 1995.  On February 29, 1996, he filed a letter complaining about counsel and requesting that the court assign counsel who would work in his best interest.  On March 18, 1996, the court held a hearing on Burton's request for appointment of new counsel.  It advised that another attorney would be appointed and if Burton did not like the second attorney, he would have to hire his own.  Burton replied he planned to try and represent himself.  The court recommended that he cooperate with his new attorney.  When Burton stated that he had the right to represent himself, the court responded: "[t]hat might be just too bad, because I am appointing a lawyer to represent you."  Burton answered: "I would like counsel appointed to assist me, but I still would like to represent myself during the trial."

On March 20, 1996, Mr. Lee Van Richardson was appointed to represent Burton.  On March 3, 1997, Burton began filing various motions.  He asked to represent himself *pro se*: "I have a right to defend myself and I insist that you allow me to have my constitutional right to defend myself . . . ."  Burton also filed numerous handwritten motions to this effect.

On March 18, 1997, Burton filed another request to represent himself *pro se*, which was followed by a serious of more *pro se* motions.  He stated that he understood and evaluated the

advantages and disadvantages of self-representation and voluntarily and unequivocally asserted his right to self-representation. The Court entered an order that Burton's motions were not filed pursuant to any orders of the Court and denied his *pro se* motions.

On June 2, 1997, Burton made a third written request for self-representation, stating he was entitled to such a right under the Sixth Amendment as provided in *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). He stated he was competent and his decision was made knowingly and voluntarily. He requested a hearing to determine if his request for self-representation would be granted. On July 10, 1997, the court entered a one-line order stating: "the defendant, Duncan E. Burton's motion for self-representation is denied." Burton filed a fourth request for self-representation on August 4, 1997, reiterating that he made the choice knowingly and voluntarily.

During a pretrial hearing on November 25, 1997, Mr. Richardson reminded the court that Burton had filed a motion to represent himself *pro se* "which he has maintained a desire to do I think throughout his involvement in this case." The court stated it had previously denied his request and would "continue denying it." During the trial on April 6, 1998, after the court admonished Burton and Williams about the effect of their co-defendants' decision to plead guilty during trial, Burton again stated that he wished to represent himself.

It is well-established that a defendant has a constitutional right to represent himself. *Faretta*, 95 S.Ct. at 2530-39. Such right is codified in 28 U.S.C. § 1654. Denial of self-representation at trial is automatically reversible error. *See Neder v. United States*, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). A defendant's assertion of his right to counsel must be "clear and unequivocal." *United States v. Kizzee*, 150 F.3d 497, 502 (5th Cir. 1998). This Court

indulges every reasonable presumption against waiver of counsel because defending *pro se* may jeopardize the defendant's chance of receiving an effective defense, and the presumption prevents the defendant from arguing denial of effective assistance of counsel on appeal. *Burton v. Collins*, 937 F.2d 131, 133 (5th Cir. 1991); *Chapman v. United States*, 553 F.2d 886, 892-93 (5th Cir. 1977). While repetition of the request to represent oneself is unnecessary under *Faretta*, the number of times a defendant repeats a request may make his intent to waive counsel clearer. *Burton*, 937 F.2d at 133 n. 3. Once an unequivocal request for self-representation is made, the district court is duty-bound to honor it. *Faretta*, 95 S.Ct. at 2540.

Since a defendant who represents himself relinquishes rights associated with the right to counsel, the district court must assure that the defendant's decision to waive counsel is made competently, knowingly and voluntarily, by advising him about the disadvantages of self-representation. *Faretta*, 95 S.Ct. at 2541. *See Martin*, 790 F.2d at 1217 (relevant factors for determining voluntary waiver are whether defendant understands the nature of the charge, consequences of proceedings and right to counsel, and defendant's background, i.e. age, education, criminal experience). Here, there was no inquiry or determination whether Burton's waiver of counsel was made knowingly and voluntarily. *See United States v. Hernandez*, WL 145969 (9th Cir. 2000) (where defendant made unequivocal request for self-representation and the court failed to provide defendant with information to allow him to make a voluntary and intelligent waiver of counsel, it denied the defendant the right of self-representation). Burton's request for self-representation was unequivocal. He was 40 years old, completed high school, attended Chicago State University, and worked at different jobs as an information systems analyst. Based on the above, the government has no evidence to refute Burton's argument. A denial of

the right of self-representation is part of a limited class of fundamental constitutional errors that defy analysis by harmless error. *See Neder*, 527 U.S. at 1 (1999). Consequently, Burton's conviction is vacated and remanded for new trial on all counts, except count 13 for which he was acquitted. *See Faretta v. California*, 95 S.Ct. at 2525 (vacating and remanded the case for proceedings not inconsistent with the Court's opinion).

IV      Speedy Trial Act.

Factual findings pertaining to the Speedy Trial Act are reviewed for clear error, but the district court's legal conclusions are reviewed *de novo*. *See United States v. Franklin*, 148 F.3d 451, 454 (5th Cir. 1998).

Burton argues that the more than two year delay between the date of the last appearance by one of his codefendants and the actual start of the combined trial violated the Speedy Trial Act. This is the most complicated issue in this appeal because an accurate assessment of Burton's claim involves tedious calculations of the exact number of non-excludable days between the last appearance of a codefendant and the actual start of trial. After counting the number of non-excludable days, we find that no Speedy Trial Act violation occurred.

Burton was indicted on December 4, 1995, in a 25-count indictment brought against 12 defendants. He appeared in court on December 20, 1995, but codefendant Cole did not appear in court until January 22, 1996, which is the date on which the Speedy Trial clock would begin to run.

Under the Speedy Trial Act, the trial of a defendant must commence within 70 non-excludable days from the latest date of the indictment or initial appearance of the last codefendant. *See United States v. Franklin*, 148 F.3d 451, 454-55 (5th Cir. 1998). Excludable days include the

time between the filing of a pretrial motion and the conclusion of the hearing on that motion, delays resulting from interlocutory appeals, and the reasonable time during which a motion is under advisement by the court which does not exceed 30 days. *See* 18 U.S.C. § 3161(h) (1) (E), (F), (J).

In a multi-defendant case, excludable delays applicable to one codefendant may be attributable to all codefendants, but the amount of delay may only be "a reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." 18 U.S.C. §§ 3161 (h) (1) (F), 3161 (h) (7).[5] On the one hand, there is a need for efficient use of judicial and prosecutorial resources when trying multi-defendants; on the other hand, delay may cause prejudice to a minor participant in a large conspiracy. *See, e.g., United States v. Blackwell*, 12 F.3d 44, 47 (5th Cir. 1994).

In this case, the trial began on March 24, 1998, approximately two years and two months after the initial appearance of the last codefendant on January 22, 1996. The government claims that the entire period from January 22, 1996 until October 13, 1997 is excludable under § 3161 (h) (1) (E), (F) and § 3161 (h) (7).

These exclusions resulted from the numerous pretrial motions filed by Burton and the other codefendants, as well as an appeal resulting from Dale's motion to suppress filed on February 24, 1996. That motion was heard on May 23, 1996, ruled upon June 10, 1996, and then appealed. The appeal remained pending until October 13, 1997.

---

[5] When there is only one defendant, all of the time between the filing of a pretrial motion and the conclusion of the hearing on that motion is allowable delay, regardless of whether the delay in holding the hearing is reasonably necessary. *See Henderson v. United States*, 476 U.S. 321 (1986), cited in *Franklin*, 148 F.3d at 455 n.10.

Because the delay caused by Dale's motion to suppress is attributable to Burton, then all of the time between January 22, 1996 and October 13, 1997 is excludable, since Burton or other codefendants had various pretrial motions pending from January 22, 1996 until Dale filed his motion to suppress on February 24, 1996.[6]

The government claims that the time between October 16, 1997 and March 24, 1998 was also excludable because of pending motions in limine. These motions, which dated back to June of 1996 were not discussed until March 8, 1998 and March 23, 1998. At these pretrial hearings, the court decided to defer ruling on these motions as motions in limine, but instead would rule on them as the evidence arose at trial.

Generally, the time between the filing of a motion in limine and a hearing on that motion (or actual trial) is excludable. *See United States v. Grosz*, 76 F.3d 1318, 1325 (5th Cir. 1996); *Franklin*, 148 F.3d at 455; *cf. United States v. Santonyo*, 890 F.2d 726, 728 (5th Cir. 1989) (excluding eight-month period between defendant's filing of motion in limine and the hearing on that motion). Burton argues that the motions in limine may not be used to exclude time because the court did not defer them until trial, but essentially denied them, stating that the court would entertain evidentiary objections only as they came up at trial.

Burton's argument makes some sense: if the court stated it would not decide the motions in limine as a pretrial matter, they should not toll the speedy trial clock past the time when the court issued that statement. However, such statements were not issued until March 8, 1998 and March 23, 1998. Even assuming that the March 8, 1998 ruling stopped any Speedy Trial Clock

---

[6] In fact, Burton specifically filed a motion on January 22, 1996 to adopt his codefendants' pretrial motions.

tolling, only 16 days elapsed between March 8, 1998 and the start of trial on March 24, 1998. Assuming that the only other days that elapsed were the days between October 13, 1997 and October 16, 1997,[7] there would still only be a total of 19 elapsed days, which would not create a violation.

Burton argues that delays attributable to other codefendants' motions cannot be reasonably attributed to him in their entirety, especially given that he was a relatively minor player in this saga. To determine whether a delay caused by one codefendant may be attributable to others in its entirety, we may examine either the totality of the circumstances prior to trial or the actual prejudice to the defendant. *See Franklin*, 148 F.3d at 457.

The government argues that the entirety of the delays caused by Burton's codefendants was reasonable to attribute to Burton in light of the circumstances prior to trial: (1) numerous defendants; (2) voluminous evidence, discovery, and witnesses; (3) extensive investigation and trial preparation; and (4) numerous notions and legal issues. Moreover, Burton, and his codefendants were charged together in only one conspiracy and Burton was involved in transactions with coconspirators Williams, Dale, McGrew, Murphy, Cole and others. Thus, there was strong reason to accommodate the efficient use of government and judicial resources to avoid several trials. *See Franklin*, 148 F.3d at 457-58 (finding that a single joint trial has compelling utility when the defendants were charged with a single conspiracy, thus allowing the government to put forward a single, cohesive factual history and group of witnesses).

---

[7] There seems to be no reason to even say that the Speedy Trial Clock was running on those three days, because the motions in limine were pending at that time. However, the government does not specifically argue that those days are excludable, Regardless, those three days should not be determinative under any line of analysis.

Burton claims, however, that he was prejudiced from the trial delay because he was incarcerated. It is not altogether clear how much weight we must give the prejudice argument if we find that the totality of circumstances prior to trial warrants charging Burton with his codefendants' delay. *Cf. Franklin*, 148 F.3d at 457-58 (examining both factors). Even if we were to afford the prejudice factor significant weight, however, the prejudice Burton complains of is either nonexistent or not attributable to the delay before trial.

The district court let Burton out on bond pending trial despite testing positive for cocaine use. The court revoked the bond only after Burton was charged with sexual assault against children and other offenses in North Carolina. Thus Burton's subsequent conduct caused his incarceration before trial, not the delay before trial. Additionally, Burton has failed to explain why the delay impaired his ability to defend himself, especially when it gave him more time to file pro se motions.

The reality of the matter is that this was a complex case, Burton was a minor but not insignificant participant, and Burton suffered no prejudice attributable to the delay. Courts routinely exclude lengthy time periods in such multi-defendant cases against all codefendants. *See, e.g., U.S. v. Mendoza-Cecelia*, 963 F.2d 1467, 1476 (11th Cir. 1992), abrogation on unrelated grounds recognized by *Coleman v. Singletary*, 30 F.3d 1420 (11th Cir. 1994) (finding that 18-month delay was reasonable under Speedy Trial Act because delays caused by codefendants did not prejudice defendant); *cf. U.S. v. Dillenia*, 763 F.2d 897, 922 (8th Cir. 1985) (finding that 18-month delay caused by codefendants was reasonable under the Sixth Amendment because any prejudice was outweighed by public interest in bringing complex case).

Thus, it appears that delays caused by motions of Burton and the other codefendants can

safely be attributed to Burton.[8]  Furthermore, we conclude that at most only 19 days of Speedy Trial Clock time elapsed, given our findings regarding the motions in limine.  Therefore, we hold that no violation of the Speedy Trial Act occurred.

V      Ineffective Assistance of Counsel.

A criminal defendant has a fundamental right to be represented by counsel at sentencing. *See United States v. Taylor*, 933 F.2d 307, 312 (5th Cir. 1991), *cert. denied*, 502 U.S. 883.  The proper standard for attorney performance is that of reasonably effective assistance.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Burton contends that trial counsel rendered ineffective assistance for failing to object to his criminal history calculation in the PSR.  This Court generally declines to review Sixth Amendment claims of ineffective assistance of counsel on direct appeal.  *Kizzee*, 150 F.3d at 502.  However, an appellate court may consider a claim regarding trial counsel's ineffectiveness if the record provides sufficient detail about the attorney's conduct to allow the court to make a determination on the merits.  *United States v. Chavez-Valencia*, 116 F.3d 127, 133 (5th cir. 1997), cert. denied, 118 S.Ct. 325 (1997).   As the issue was not raised in the district court, the record is insufficient to enable direct review.

**CONCLUSION**

As to Williams, we hold that the evidence was sufficient on all counts to support Williams's convictions for conspiracy and aiding and abetting possession with intent to distribute cocaine.  We conclude that Williams has failed to establish a Jencks Act violation.  Accordingly,

---

[8]  That is, except for the time after the court decided not to consider the motions in limine.

we AFFIRM Williams's convictions on all counts.

As to Burton, we let stand his acquittal on count 13 and decline to dismiss his convictions on counts 1, 14, 15, 16, 17, 19 and 20.  Since the district court denied Burton his right of self-representation, this Court must vacate and remand for Burton to have a new trial on all counts, excluding count 13.   We uphold the district court's decision to deny Burton's motion to dismiss indictment for violation of the Speedy Trial Act.  Furthermore, we find that the record is insufficiently developed to review Burton's claim that counsel rendered ineffective assistance of counsel at sentencing.  Therefore, letting stand Burton's acquittal on count 13, we VACATE Burton's convictions on counts 1, 14, 15, 16, 17, 19 and 20, and REMAND for a new trial.